[Civ. No. 49576. First Dist., Div. Three. Oct. 1, 1982.]

GEORGE GOMES, Plaintiff and Appellant, v.
MICHAEL R. FRIED et al., Defendants and Appellants.

COUNSEL

Christopher D. Burdick and Carroll, Burdick & McDonough for Plaintiff and Appellant.

Margaret C. Crosby, Alan L. Schlosser, Amitai Schwartz, Stephen R. Barnett and David W. Hettig for Defendants and Appellants.

OPINION

**FEINBERG, J.**—This action for libel was brought by plaintiff George Gomes (Gomes), a San Leandro police officer, on the basis of an article written by appellant Ad Fried, the editor of The Friday Observer (Observer), a weekly newspaper, published by Ad's son, appellant Michael Fried, doing business as appellant the Observer Publishing Company (collectively Frids). After a six-day jury trial in which the Frids were in pro. per., the jury returned a special verdict awarding Gomes $20,000 general and $25,000 special damages against the Frids, as well as punitive damages of $40,000 against Michael and $75,000 against Ad. The court denied the Frids' motion for a judgment notwithstanding the verdict but conditionally granted a new trial on the issue of damages unless Gomes consented to a reduction of the general damages to $20,000 and the punitive damages to $10,000 against Ad and $5,000 against Michael. Gomes consented to the reduction. The Frids appeal from the final judgment and the order denying their motion for a judgment notwithstanding the verdict, and Gomes cross-appeals from the conditional order granting the new trial and from the judgment as entered on his consent to the reduced damages. We have concluded that both the judgment and order must be reversed because Gomes did not meet the preconditions of Civil Code section 48a.

We set forth only the facts relevant to the limited questions of law we address on this appeal. The article appeared on the front page of the Observer issue for the week of February 6-12, 1974, and was entitled "HOW GOOD ARE THE SAN LEANDRO POLICE?, An Observer Editorial Comment by Ad Fried." The article (set forth below so far as pertinent) was accompanied by two photographs; the smaller one showed Gomes sitting in his police car with his head tilted to one side, and was accompanied by the following caption: "OFFICER GOMES car shown in the center of the lightly traveled Bristol Avenue (Sunday Afternoon) prowling for traffic violations. *His head tilted may suggest something.*" (Italics added.)

The first three paragraphs of the article praised the San Leandro Police Department, and its present and former chiefs.

The article then continued as follows:

"KEEPING THE PEACE

"Generally speaking, the Police Department does a superb job of keeping peace and providing community law and order. Local police assist the

aged, needy and stalled vehicles. Nevertheless, San Leandro police actions should be evaluated as follows:

"(1) Not all, but a few police officers are too officious, having an exaggerated opinion of themselves and are way out of line in performance of their duties. They overact during certain situations.

"(2) Some young officers should show greater respect for the public. They should not 'put-down' anybody—just do a job—not fight with citizens, but be courteous to them.

### "OFFICERS NOT IMMUNE

"(3) Officers are not immune from violating the law, just because they're on duty. This includes careless parking, speeding when unnecessary, tailgating other cars, etc.

"(4) The excessive use of force during arrests for minor violations, especially when not required, is just as criminal as any civilian's assault or attack on another.

"(5) The ganging up of police cars behind traffic violators is, not only a waste of the taxpayers money for tying up the extra manpower, but I suggest such 'backups' cover other, more violent areas.

### " 'GANG-UP' RIDICULOUS

"(6) The 'gang up'—several police cars, with all lights going, pursuing the same car—when not necessary—scares the wits out of a single violator, male or female, in a ridiculous overdisplay of police force.

"(7) The tailing of cars for many miles constitutes harassment, especially when there is no immediate appearance of any law violation, and the officer pursues the car until he causes the nervous and scared driver to finally commit some violation.

"(8) The excessive speeds, with all sirens and lights going, risking other's lives, when the police car is not in actual pursuit, is illegal and should be avoided.

### "PERSONAL EXPERIENCE RECENTLY

"Last Sunday, while we were calling on a carrier's family on Bristol Avenue (the street had practically no traffic—see pictures elsewhere), and

we double-parked for a moment, a squad car (driven by Officer Gomes #079) came by and began citing us. Shortly thereafter another squad car (driven by Officer Ted Alves #107) came and double-parked behind my car . . . in exactly the same manner for which I was cited.

"When I told Officer Alves that I would like to cite him for what I was cited (a Citizen's Arrest), he replied, 'I can't be cited. I am in the performance of my duty.' I replied . . .

#### " 'A CITIZEN'S ARREST?'

"Officer Alves, you are in violation of the parking ordinance and I insist upon citing you. This is a citizen's arrest.' The officer refused to accept my 'Citizen's Arrest.'

"I then offered to personally sign a complaint against the offending driver, but the officers refused to accept the challenge and write it up. In the meantime, Officer Alves remained double-parked for at least 40 minutes.

"Also, while Officer Gomes was writing the ticket for the alleged offense, I noticed that he, himself had violated the law by parking at least 40 inches from the curb (see pictures of same elsewhere[1] in this issue). I asked Officer Alves to cite his fellow [*sic*] for this offense. Alves refused.

#### "OFFICERS' ADDITIONAL VIOLATIONS

"Now, both officers, Gomes and Alves should be cited for 'conduct unbecoming officers' and 'for failure to perform their duty (function in citizen's arrest).' We intend to pursue this further by bringing the charges in the Police Department itself or through the District Attorney's office, which will be contacted very shortly.

" . . . . . . . . . . . . . . . . . . . . . . . . . ."[2]

---

[1]This photograph on the second page was captioned as follows: "OFFICER GOMES writes a double parking citation on the seldom Sunday travelled residential street (Bristol) while his squad car illegally is more than 40 inches from the curb, permitting the dark shadows (formed at 12:30 p.m., right after noontime), to emphasize the disparity from the legal parking distance of over a foot and one half. Neither he nor, a fellow officer, would permit a citizen's arrest of the other."

[2]The omitted three paragraphs dealt with an incident on East 14th Street in which Gomes admittedly was not involved.

"New Request of Police

"We respectfully ask the proper authorities to insist that San Leandro policemen show more respect for individual rights. Otherwise, the community will deteriorate into a police state and the fearful result of another totalitarian state, Hitler or Stalin style."

The next issue of the Observer corrected an error in the article, to accurately state that Michael, who was driving, rather than Ad, had received the parking ticket from Gomes. The next three weekly editions of the Observer published some of the many letters to the editor that the publication received in response; some were critical, some laudatory.

On October 4, 1974, Gomes filed his complaint seeking special damages of $5,000, general damages of $100,000 and punitive damages of $100,000. The complaint alleged, inter alia, that on or about February 22, 1974, Gomes had served on the Frieds a demand for retraction pursuant to Civil Code section 48a (quoted and discussed in detail below at pp. 936-939) and that no retraction had been published.

The trial court instructed the jury that under the First Amendment of the United States Constitution, and extended to state court libel actions by the Fourteenth Amendment, Gomes' conduct as a police officer was subject to the qualified constitutional privilege, fair comment, as first set forth in *New York Times Co.* v. *Sullivan* (1964) 376 U.S. 254 [11 L.Ed.2d 686, 84 S.Ct. 710, 95 A.L.R.2d 1412]. The ruling established that in a defamation action brought by a "public official," the plaintiff must prove that the publication was false, and that the publication was with "actual malice," defined as publishing "with knowledge that it was false or with reckless disregard of whether it was false or not." (*Id.*, at p. 280 [11 L.Ed.2d at p. 706]; see also *Cox Broadcasting Corp.* v. *Cohn* (1975) 420 U.S 469, 490 [43 L.Ed.2d 328, 346, 95 S.Ct. 1029].) On review we must determine whether the above principles were constitutionally applied, "but this does not involve a de novo review of the trial court proceedings wherein the jury's verdict is entitled to no weight." (*Widener* v. *Pacific Gas & Electric Co.* (1977) 75 Cal.App.3d 415, 433 [142 Cal.Rptr. 304], cert. den. 436 U.S. 918 [56 L.Ed.2d 759, 98 S.Ct. 2265].) In its specification of reasons for granting the new trial on the issue of damages, the court stated that: (1) there was no basis for punitive damages as the only portion of the article that was not "fair comment" was the front page photograph of Gomes; and (2) Gomes had failed to prove special damages.

Further, the rule of review is that all presumptions favor the order granting a new trial so that such orders are rarely reversed. (See, e.g.,

*Mercer* v. *Perez* (1968) 68 Cal.2d 104, 112-113 [65 Cal.Rptr. 315, 436 P.2d 315]; *Miller* v. *National American Life Ins. Co.* (1976) 54 Cal.App. 3d 331, 345 [126 Cal.Rptr. 731]; *People* ex rel. *Dept. of Pub. Wks.* v. *Hunt* (1969) 2 Cal.App.3d 158, 163-164 [82 Cal.Rptr. 546]; *Osborne* v. *Cal-Am Financial Corp.* (1978) 80 Cal.App.3d 259, 265 [145 Cal.Rptr. 584].)

■ As it determines both the standard for and scope of our review of the record, we turn first to Gomes' contention that the court erred in applying the *New York Times* standard because he was not a "public official."

In *Rosenblatt* v. *Baer* (1966) 383 U.S. 75 [15 L.Ed.2d 597, 86 S.Ct. 669], the United States Supreme Court rejected state law standards as the basis for determining who is a "public official" (at p. 84 [15 L.Ed.2d at p. 604]). While the court did not define the term, it did say:

"The motivating force for the decision in *New York Times* was twofold. We expressed 'a *profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that [such debate] may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.*' 376 U.S., at 270. (Emphasis supplied.) There is, first, a strong interest in debate on public issues, and second, *a strong interest in debate about those persons who are in a position significantly to influence the resolution of those issues.* Criticism of government is at the very center of the constitutionally protected area of free discussion. *Criticism of those responsible for government operations must be free, lest criticism of government itself be penalized.* It is clear, therefore, that *the 'public official' designation applies at the very least to those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs.*

"This conclusion does not ignore the important social values which underlie the law of defamation. Society has a pervasive and strong interest in preventing and redressing attacks upon reputation. But in cases like the present, there is tension between this interest and the values nurtured by the First and Fourteenth Amendments. The thrust of *New York Times* is that when interests in public discussion are particularly strong, as they were in that case, the Constitution limits the protections afforded by the law of defamation. *Where a position in government has such apparent importance that the public has an independent interest in the qualifications and performance of the person who holds it, beyond the general public interest in the qualifications and performance of all government employees, both elements*

*we identified in New York Times are present and the New York Times malice standards apply."* (At pp. 85-86 [15 L.Ed.2d at pp. 605-606], italics partially added, fns. omitted.)

Relying on *Franklin v. Benevolent etc. Order of Elks* (1979) 97 Cal.App.3d 915 [159 Cal.Rptr. 131], Gomes argues that he was a simple police officer occupying the lowest rung of the ladder. In *Franklin, supra,* this court (Div. One), held, at pages 922-925, that a high school teacher was not within the *New York Times* rule, as the governance or control she exercised was far too remote and philosophical. The Frieds, on the other hand, attempt to argue that the issue was settled in their favor by *Mullins* v. *Brando* (1970) 13 Cal.App.3d 409, footnote 5 at page 415, [91 Cal.Rptr. 796] cert. den. 403 U.S. 923 [29 L.Ed.2d 701, 91 S.Ct. 2231]. In *Mullins,* however, the plaintiffs conceded the issue.

In applying the federal standard, we find persuasive the following discussion of the Supreme Court of Illinois in *Coursey* v. *Greater Niles Township Publishing Corp.* (1968) 40 Ill.2d 257 [239 N.E.2d 837, at page 841]: "It is our opinion that the plaintiff is within the 'public official' classification. Although *as a patrolman he is 'the lowest in rank of police officials'* and would have slight voice in setting departmental policies, *his duties are peculiarly 'governmental' in character and highly charged with the public interest.* It is indisputable that *law enforcement is a primary function of local government* and *that the public has a far greater interest in the qualifications and conduct of law enforcement officers,* even at, and perhaps *especially at,* an *'on the street' level* than in the qualifications and conduct of other comparably low-ranking government employees performing more proprietary functions. *The abuse of a patrolman's office can have great potentiality for social harm*; hence, public discussion and public criticism directed towards the performance of that office cannot constitutionally be inhibited by threat of prosecution under State libel laws." (Italics added.)

Thus, the courts have uniformly held that a patrolman or low-level police officer is a "public official" for the purpose of the *New York Times* privilege. (*St. Amant* v. *Thompson* (1968) 390 U.S. 727, 730 [20 L.Ed.2d 262, 266-267, 88 S.Ct. 1323] (parish deputy sheriff); *Rosales* v. *City of Eloy* (1979) 122 Ariz. 134 [593 P.2d 688] (sergeant on city police force); *Malerba* v. *Newsday* (1978) 64 App.Div.2d 623 [406 N.Y.S.2d 552] (patrolman); *Delia* v. *Berkey* (1978) 41 Md.App. 47 [395 A.2d 1189] (uniformed county police officer on patrol); *Ramacciotti* v. *Zinn* (Mo.App. 1977.) 550 S.W.2d 217 (city police sergeant); *Hirman* v. *Rogers* (Minn. 1977) 257 N.W.2d 563, 566 (police officers and deputy sheriff); *N. A. A. C. P.* v. *Moody* (Miss. 1977) 350 So.2d 1365 (highway patrol officer);

*Moriarty* v. *Lippe* (1972) 162 Conn. 371 [294 A.2d 326, 330-331] (patrolman); *Scelfo* v. *Rutgers University* (1971) 116 N.J.Super. 403 [282 A.2d 445, 449] (municipal policemen); *Jackson* v. *Filliben* (Del. 1971) 281 A.2d 604, 605 (police sergeant).)

We hold that the trial court properly concluded that Gomes was a "public official."

■ We turn next to Gomes' contention that the trial court erred in concluding that the only part of the article which was not within the constitutional privilege of fair comment was the front page picture of Gomes with its caption. ■ In a defamation action brought by a public official who falls within the constitutional constraints of the *New York Times* rule, actual malice may never be presumed. The burden of proving actual malice is upon the one alleging defamatory statements and it must be proved by clear and convincing evidence. (*Weingarten* v. *Block* (1980) 102 Cal.App.3d 129, 144 [162 Cal.Rptr 701], cert. den. 449 U.S. 899 [66 L.Ed.2d 128, 101 S.Ct. 267].) ■ Gomes had the burden of proving not only that the Frieds' article was false but that it was knowingly so or was circulated with reckless disregard of whether it was false or not. Reckless conduct is not measured by whether a reasonably prudent man would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact, subjectively entertained serious doubts as to the truth of his publication. (*St. Amant* v. *Thompson* (1968) 390 U.S. 727, 731 [20 L.Ed.2d 262, 267, 88 S.Ct. 1323].)

■ "Actual malice" under the *New York Times* standard focuses on the defendant's attitude toward the truth or falsity of his published material rather than on the defendant's attitude toward the plaintiff. (*Cantrell* v. *Forest City Publishing Co.* (1974) 419 U.S. 245, 251-252 [42 L.Ed.2d 419, 426, 95 S.Ct. 465].) Under that standard, ill will does not constitute proof of knowledge of falsity. (*Hotchner* v. *Castillo-Puche* (2d Cir. 1977) 551 F.2d 910, 914, cert. den. 434 U.S. 834 [54 L.Ed.2d 95, 98 S.Ct. 120].)

■ Gomes complains that the article inaccurately and incompletely described the arrest. However, the Frieds were not required to provide an objective picture (*New York Times Company* v. *Connor* (5th Cir. 1966) 365 F.2d 567, 576) or an accurate one. (Cf. *Time, Inc.* v. *Pape* (1971) 401 U.S. 279 [28 L.Ed.2d 45, 91 S.Ct. 633].) ■ Factual error alone will not suffice. (*Fadell* v. *Minneapolis Star & Tribune Co., Inc.* (7th Cir. 1977) 557 F.2d 107, cert. den. 434 U.S. 966 [54 L.Ed.2d 452, 98 S.Ct. 508].) Nor can recklessness be established by a showing that the reporting

was speculative or sloppy. (*Oliver* v. *Village Voice, Inc.* (S.D.N.Y. 1976) 417 F.Supp. 235, 238.)

■■■ A difference of perspective between an arresting officer and a citizen who has been arrested is normal. Charges that an officer was abusive or used unnecessary force or did not treat the arrested citizen with sufficient respect, or outraged or hyperbolic comments by the citizen are to be routinely expected by the arresting officer. (Cf. *Moriarty* v. *Lippe, supra,* 294 A.2d 326, 333 (statement that "this ape almost twisted my arm off," held not actionable); *LaRocca* v. *New York News, Inc.* (1978) 156 N.J.Super. 59 [383 A.2d 451, 452] ("[b]ut we give the police a big fat F for dunderheadedness" and cartoon portraying a policeman in a dunce cap, within fair comment privilege); *Orr* v. *Lynch* (1978) 60 App.Div.2d 949 [401 N.Y.S.2d 897, 899] (statement that officer "opened fire" and "gunned down" suspect, was "rhetorical hyperbole" in context of broadcast and within privilege).)

The statements concerning Gomes' failure to help with a citizen's arrest of his fellow officer on the same parking violation for which the Frieds were being cited were statements of opinion and therefore not actionable. (*Gregory* v. *McDonnell Douglas Corp.* (1976) 17 Cal.3d 596, 600-601 [131 Cal.Rptr. 641, 552 P.2d 425].)

As to the photograph of Gomes with his head tilted, the record indicates that the photograph was taken by Michael while Gomes was writing the citation. While, as the Frieds point out, Gomes admitted that the photograph was accurate, its potentially defamatory aspect arises from their innuendo in the caption: "His head tilted may suggest something." What this caption apparently suggested to ordinary readers was that Gomes was sleeping on duty. Numerous readers so stated in their subsequent letters to the Observer and Gomes testified that he was called "Sleepy" and identified as the sleeping officer. The Frieds knew that Gomes was not sleeping but writing the citation at the time Michael took Gomes' photograph. Thus, the publication of this photograph with the innuendo in the caption, viewed in the light most favorable to Gomes, was reasonably susceptible of a libelous meaning under the clear and convincing evidence standard.

We hold that the trial court properly concluded that the only possible defamatory portion of the article was the front page picture of Gomes with its caption.

■ We turn next to the Frieds' contention that Gomes did not meet the preconditions of Civil Code section 48a.[3] Whether Gomes met the requirements of the statute is a question of law. ■ Preliminarily, we dispose of Gomes' argument that the Frieds are precluded from raising this issue as it was raised for the first time in their motions for a new trial and a judgment notwithstanding the verdict. There was no dispute as to the contents of the February 22, 1974, letter demanding a retraction allegedly sent[4] by counsel for Gomes to the Observer. (*Panopulos* v. *Maderis* (1956) 47 Cal.2d 337, 341 [303 P.2d 738]; *Molina* v. *Retail Clerks Unions etc. Benefit Fund* (1980) 111 Cal.App.3d 872, 878 [168 Cal.Rptr. 906].) Further, the constitutional privilege discussed above, as well as the purpose of the statute, described below, both raise questions of public policy. (Cf. *Griswold* v. *Mt. Diablo Unified Sch. Dist.* (1976) 63 Cal.App.3d 648, 653 [134 Cal.Rptr. 3].) Accordingly, we hold the issue is properly before us.

So far as pertinent, the letter stated: ■ "In his article, Mr. Fried *directly accuses officers Gomes and Alves* of '*conduct unbecoming officers*' and '*failure to perform their duty,*' *both of which are offenses for which* Alves and *Gomes may be subject to dismissal* from the police department, and *both* of which they, under the circumstances alleged by Mr. Fried in his article, amount to *violations of sections of the California Penal Code.* In addition to the *direct imputation of criminal acts* by Alves and Gomes as set forth in the article, by implication and innuendo, *the article attributes to* Alves and *Gomes,* among other San Leandro police officers, 'the use of

---

[3]Civil Code section 48a, subdivisions 1 and 2, provide: "1. In any action for damages for the publication of a libel in a newspaper, or of a slander by radio broadcast, *plaintiff shall recover no more than special damages* unless a correction be demanded and be not published or broadcast, as hereinafter provided. *Plaintiff shall serve upon the publisher*, at the place of publication or broadcaster at the place of broadcast, *a written notice specifying the statements claimed to be libelous and demanding that the same be corrected.* Said notice and demand must be served within 20 days after knowledge of the publication or broadcast of the statements claimed to be libelous.

"2. *If a correction be demanded within said period* and be not published or broadcast in substantially as conspicuous a manner in said newspaper or on said broadcasting station as were the statements claimed to be libelous, in a regular issue thereof published or broadcast within three weeks after such service, *plaintiff, if he pleads and proves such notice, demand and failure to correct*, and if his cause of action be maintained, *may recover general, special and exemplary damages*; provided that *no exemplary damages may be recovered unless the plaintiff shall prove that defendant made the publication or broadcast with actual malice* and then only in the discretion of the court or jury, and actual malice shall not be inferred or presumed from the publication or broadcast." (Italics added).

[4]As the Frieds denied receiving the letter, a part of the trial focused on this issue. The jury was instructed that the retraction demand could be served by ordinary mail and that it was presumed served when deposited in the mail. The special verdict found that the retraction demand had been served on the publisher, as required by the statute. We do not need to reach the service issue, in view of our conclusion that Gomes did not meet the specification requirement.

*excessive force during arrest,*' '*ganging up* of police cars,' and *unspecified violations of the law, including violations of the civil rights of citizens.* Naturally, *any imputation of such acts to* officers Alves and *Gomes has* a direct, *damaging effect* upon them in their chosen profession, that of police officers, and the allegations are completely unfounded and untrue, and Mr. *Fried knew them to be unfounded and untrue* at the time he made them."[5] (Italics added.)

The purpose of the Civil Code section 48a[6] notice requirement was described by our Supreme Court, as follows, in the leading case, *Kapellas* v. *Kofman* (1969) 1 Cal.3d 20, at pages 30-31 [81 Cal.Rptr. 360, 459 P.2d 912]: ". . . to facilitate the publisher's investigative efforts in determining whether statements in the initial article contained error and should be corrected. By designating the remarks that the objector considers libelous, a notice may enable the publisher to narrow the scope of his investigation. We recognize, however, that letters written to request retraction of a statement do not compose formal legal complaints; we cannot expect that they will conform to the niceties of common law pleading. In enacting section 48a the Legislature intended to afford publishers an opportunity to correct committed errors before subjecting them to liability; it did not intend to build technical barricades to recovery by the individual who had given notice sufficient to advise a reasonable publisher acting in good faith of the claimed error.

■ "The *crucial issue* in evaluating the adequacy of the notice *turns on whether the publisher should reasonably have comprehended which statements plaintiff protested and wished corrected. (MacLeod* v. *Tribune Publishing Co.* (1959) 52 Cal.2d 536, 554 . . . .)" (Italics added to text.)

In *Kapellas, supra,* 1 Cal.3d 20, the notice specifically designated as libelous every statement concerning the qualifications of a candidate and the conduct of her children. The Supreme Court held that the demand was sufficiently specific for the purposes of the statute. The court also discussed *MacLeod* v. *Tribune Publishing Co., supra,* 52 Cal.2d at pages 553-554 [343 P.2d 36], in which a request for the retraction of an entire but short article was held sufficient, and commented that the length of the article was significant only to the extent that it affected the comprehensibility of the notice. The court also noted that it was sufficient, if from the article and the notice together, the publisher can without difficulty determine the words that contain the sting and should be retracted. (*Kapellas, supra,* 1 Cal.3d at p. 32, fn. 13.)

---

[5]The final portion of the letter referred to the 14th Street incident in which Gomes was not involved.

[6]All future references are to the Civil Code unless otherwise indicated.

■ The question here is whether from the above quoted language demanding retraction, the Frieds should reasonably have comprehended that the front page photograph and its caption were included in the language Gomes wished to have corrected. We think not.

The length and complexity of the article, with its several pictures and references to several incidents and numerous officers, required a high degree of specificity. Since the statute expressly and clearly requires that the plaintiff shall "specify" defamatory material, he must do so with particularity. Cf. *Hulander* v. *Sunbeam Television Corp.* (Fla. App. 1978) 364 So.2d 845, 847.) The degree of particularity depends on the character of the libel on which it is brought. Here, as we have indicated above, the language of the article was not libelous per se and subject to the constitutional privilege of fair comment. The photograph also was not libelous per se. The request for a retraction referred only to statements and did not mention either the photograph or its caption. Under these circumstances, the publisher could not be expected to comprehend from the letter that Gomes also was requesting a retraction of an admittedly accurate photograph and its caption. (Cf. *Southeastern Newspapers* v. *Walker* (1947) 76 Ga.App. 57 [44 S.E.2d 697, 702].) We think, therefore, that the instant case falls within the rule of *Anderson* v. *Hearst Pub. Co.* (S.D.Cal. 1954) 120 F.Supp. 850 (request for "certain statements" inadequate to give the publisher any indication of the statements to which objections were leveled).

We conclude that since the instant demand for retraction failed to specify with particularity the only potentially libelous part of the article, the front page photograph and its caption, Gomes did not meet that condition precedent of section 48a. Therefore, he could not recover general damages.

■ Finally, we turn to the question of whether Gomes proved special damages as defined by section 48a, subdivision 4,[7] set forth below in per-

---

[7]Section 48a, subdivision 4, provides: "4. As used herein, the terms 'general damages,' 'special damages,' [and] 'exemplary damages' . . . are defined as follows:

"(a) 'General damages' are damages for loss of reputation, shame, mortification and hurt feelings;

"(b) *Special damages* are all damages which plaintiff alleges and proves that he has suffered in respect to *his property, business, trade, profession or occupation,* including such amounts of money as the plaintiff alleges and proves he has expended as a result of the alleged libel, and no other;

"(c) 'Exemplary damages' are damages which may in the discretion of the court or jury be recovered in addition to general and special damages for the sake of example and by way of punishing a defendant who has made the publication or broadcast with actual malice;

". . . . . . . . . . . . . . . . . . . . . ." (Italics added.)

tinent part. The definitions were added in 1945 (Stats. 1945, ch. 1489, § 5, p. 2763), along with section 45a (Stats. 1945, ch. 1489, § 1, p. 2762), which provides: "A libel which is defamatory of the plaintiff without the necessity of explanatory matter, such as an inducement, innuendo or other extrinsic fact, is said to be a libel on its face. Defamatory language not libelous on its face is not actionable unless the plaintiff alleges and proves that he has suffered special damage as a proximate result thereof. Special damage is defined in Section 48a of this code."

■ Where, as here, the defamatory language is not libelous on its face, unless the plaintiff proves special damage as defined by section 48a, no cause of action arises. (*Forsher* v. *Bugliosi* (1980) 26 Cal.3d 792, 807 [163 Cal.Rptr. 628, 608 P.2d 716].)

■ In upholding the constitutionality of section 48a, our Supreme Court described the broad purposes that the Legislature sought to achieve, as follows:

"There are at least two bases on which the Legislature could reasonably conclude that the retraction provisions of Section 48a provide a reasonable substitute for general damages in actions for defamation against newspapers and radio stations, namely, the danger of excessive recoveries of general damages in libel actions and the public interest in the free dissemination of news.

"General damages are allowed for 'loss of reputation, shame, mortification and hurt feelings' (Civ. Code, § 48a), but the extent of such injuries is difficult to determine. At common law it was conclusively presumed that general damages resulted from the publication of a libel. . . . The Legislature could reasonably conclude that recovery of damages without proof of injury constitutes an evil." (*Werner* v. *Southern California Associated Newspapers* (1950) 35 Cal.2d 121, 126 [216 P.2d 825, 13 A.L.R.2d 252].)

Section 48a, when read with section 45a, clearly indicates that a plaintiff who has not properly demanded a retraction, "shall recover no more than special damages." Gomes' argument that section 48a was designed to limit only the class of plaintiffs, rather than the damages recoverable, does not square with section 45a, or the section 48a mutually exclusive definitions of the categories of damages. As defined, general damages encompass the loss of reputation, shame and mortification and hurt feelings in any context, including the plaintiff's trade or business (cf. *Correia* v. *Santos* (1961) 191 Cal.App.2d 844, 856-857 [13 Cal.Rptr. 132]); special damages are defined narrowly to encompass only economic loss. Special damages were defined

to mean "pecuniary loss" in *Childers* v. *San Jose Mercury Printing & Publishing Co.* (1894) 105 Cal. 284, 288-289 [38 P. 903]; *Peabody* v. *Barham* (1942) 52 Cal.App.2d 581 [126 P.2d 668], disapproved on other grounds in *MacLeod* v. *Tribune Publishing Co.*, *supra*, 52 Cal.2d 536. In this state, special damages must be pled and proved precisely. (*Anderson* v. *Hearst Pub. Co.*, *supra*, 120 F.Supp. 850, 852.) In *MacLeod*, *supra*, the special damage allegations were sufficient, as the plaintiff, a dentist, alleged a pecuniary loss in his profession since an unusually large percentage of old and established patients cancelled appointments and there was a sharp decline in the number of new patients normally to be expected, although the amount was not yet ascertainable. (Accord, *Forsher* v. *Bugliosi*, *supra*, 26 Cal.3d at p. 807.) In *Washer* v. *Bank of America* (1943) 21 Cal.2d 822, 825, 829 [136 P.2d 297, 155 A.L.R. 1338], overruled on other grounds, 52 Cal.2d 551, the plaintiff bank manager met the requirement by alleging that he had been refused employment at various banks and would be unable to secure employment at any other bank. In *Pridonoff* v. *Balakovich* (1951) 36 Cal.2d 788, 792 [228 P.2d 6], the court held that a general allegation of loss of prospective employment was not sufficient, but that the loss of specific employment with a specific employer was. (Accord *Haynes* v. *Alverno Heights Hospital* (Okla. 1973) 515 P.2d 568, allegation of damage to personnel rating and standing with employer held insufficient for special damages where the discharge of the employee did not result from the defamatory letter; *Cook* v. *Safeway Stores, Inc.* (1973) 266 Ore. 77 [511 P.2d 375], inability to secure employment insufficient for claim of special damages, but admissible as to claim for general damages.)

Here, Gomes admitted that he suffered no financial out-of-pocket losses as a result of the Observer article; he lost no time from work, incurred no medical or other bills, and no economic loss in his employment. He attempted to establish that the article had hurt his chances in the oral part of a promotional examination. However, he had failed the examination twice in 1974 before the article was published; he took the examination once after the publication and passed. He then ranked eighth on a list of sixteen, of which only the top one or two were promoted. He conceded that he did not know whether he would have been promoted in the absence of the article. Contrary to his contentions, his loss of reputation, hurt feelings and depression were elements of general rather than special damages within the meaning of section 48a. We hold that the trial court properly concluded that Gomes failed to prove any special damages.

### Conclusion

 Thus, as a matter of law, Gomes was not entitled to general damages because of the insufficiency of the demand for retraction. 

He was not entitled to special damages because he proved none. It therefore follows that the judgment must be and is reversed. The trial court is directed to set aside its conditional order granting a new trial and to enter its judgment in favor of the Frieds. (Cf. *DiGiorgio Corp* v. *Valley Labor Citizen* (1968) 260 Cal.App.2d 268, 281 [67 Cal.Rptr. 82].) Frieds to have their costs on appeal.

Scott, Acting P. J., and Barry-Deal, J., concurred.

A petition for a rehearing was denied October 27, 1982, and the petition of plaintiff and appellant for a hearing by the Supreme Court was denied December 8, 1982. Newman, J., and Broussard, J., did not participate therein.