[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 778 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 779 
John Raymond Wiggins ("Raymond") and his son, John Raymond Wiggins II ("John"), appeal from an order denying their motion to vacate, alter, or amend a summary judgment entered against them in their defamation action against the Town of East Brewton, East Brewton Police Chief Wilson Mallard, Brewton Newspapers, Inc., d/b/aThe Brewton Standard ("the Standard"), and John Wallace, the managing editor of the Standard. We reverse and remand.
This case arises out of the publication of the August 9, 2000, issue of the Standard. On that date, Raymond and John resided at their home at 2474 Bradley Road, on the outskirts of East Brewton. Raymond was personally acquainted with Wallace and Chief Mallard. Chief Mallard had known Raymond for three or four years, and Wallace became acquainted with Raymond during a 2000 political campaign in which Raymond unsuccessfully sought the *Page 780 
office of Escambia County commissioner. More specifically, Wallace's acquaintance with Raymond grew out of Raymond's numerous visits to the office of the Standard to purchase newspaper space for his campaign advertisements and to distribute his campaign literature.
In a telephone conversation with Wallace on August 8, 2000, Chief Mallard, reading from a police report, informed Wallace that three individuals had been arrested the previous weekend for "possession of drug paraphernalia and possession of marijuana." The particulars of that conversation are sharply disputed. Byall accounts, however, Chief Mallard told Wallace that one of the arrestees was an individual named "Wiggins." According to Chief Mallard, he told Wallace that the arrestee's name wasClinton Keith Wiggins. According to Wallace, Chief Mallard said that the arrestee's name was Raymond Wiggins and that his address was 2474 Bradley Road.
On the day following that conversation, an article was published on the front page of the Standard. The article stated that "Raymond Wiggins of 2724[1] Bradley Road" was one of three individuals arrested on "drug charges." It is undisputed that no one named "Raymond Wiggins" had, in fact, been arrested.
On August 9, 2000, the day the article appeared in theStandard, Raymond personally contacted both Wallace and Chief Mallard. Wallace told Raymond that he had printed the information just as Chief Mallard had given it to him, and Chief Mallard denied that he had given Wallace the information that was published in the article. That same day, in a special edition, the Standard printed a correction.
On April 13, 2001, John and Raymond filed a two-count complaint against Chief Mallard, East Brewton, Wallace, and the Standard.
The count against Chief Mallard and East Brewton averred that Chief Mallard had "wrongfully conveyed to [Wallace] the name of Raymond Wiggins" as an individual who had been arrested on drug charges, which statement it alleged was "knowingly false" and made "intentionally . . . for the purpose of humiliating and defaming either or both of the plaintiffs." The count against Wallace and the Standard averred that Wallace and theStandard published the article "with knowledge of the falsity of the statement that Raymond Wiggins was arrested or with a reckless disregard of whether the statement was true or false." The complaint sought compensatory and punitive damages.
On August 21, 2002, Wallace and the Standard filed a motion for a summary judgment. They argued that "under Alabama law, publications regarding arrests are qualifiedly privileged." For that proposition, they cited Wilson v. Birmingham Post Co.,482 So.2d 1209 (Ala. 1986). The existence of this qualified privilege, they insisted, cast upon John and Raymond "`the burden of proving defamation with actual malice.'" (Quoting Ex parteBlue Cross Blue Shield of Alabama, 773 So.2d 475, 478 (Ala. 2000).) The Wigginses responded to that motion, contending that "the defense of qualified privilege is not applicable" to Wallace and the Standard.
On December 11, 2002, Chief Mallard and East Brewton filed a motion for a summary judgment. They argued, among other things, that Chief Mallard's statement to Wallace was privileged and, consequently, that the Wigginses "have not established, *Page 781 
and cannot establish, malice." On January 30, 2003, the Wigginses filed a response to Chief Mallard and East Brewton's motion. They argued, in pertinent part:
 "The only logical conclusion of what happened, assuming that the finder of fact believes the testimony of John Wallace, is that Wilson Mallard lied to him when he identified Raymond Wiggins of Bradley Road as being one of the persons arrested on drug charges. Such a misstatement by a police office[r] creates a genuine issue of material fact as to whether the municipal police officer acted in bad faith, with malice or wilfulness. . . . Of course, Mallard knew that Raymond Wiggins had not been arrested. Therefore, he acted with knowledge of this falsity, according to John Wallace. Substantial evidence of publication with knowledge of falsity creates a triable issue as to malice."
The trial court granted the defendants' motions, stating:
 "The defendants have asserted the defense of [qualified] privilege and the court finds that the complained-of communication qualifies for the privilege because it was prompted by a duty owed to the public and involved matters of public concern. The court finds that the plaintiffs are private persons [within the context of New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)]. Having determined that the plaintiffs are private persons and the defense of qualified privilege applies, the plaintiffs bear the burden of proving defamation with actual malice to prevail against a defense of qualified privilege. Ex parte Blue Cross and Blue Shield of Alabama, 773 So.2d 475
(Ala. 2000). Even though the Brewton Standard
reported that a person named Raymond Wiggins had been arrested for drug possession, the record does not contain substantial evidence that the defendants acted with actual or common law malice. Neither plaintiff knew of any evidence of previous ill will or spite, hostility, threats, other actions, or former libels or slanders committed by the defendants toward either of the plaintiffs. Also, there is no substantial evidence of malice as a result of the defendants' language or the mode and extent of publication."
(Emphasis added.)
The Wigginses moved to alter, amend, or vacate the summary judgment. That motion was denied by operation of law after it had been pending for 90 days, Rule 59.1, Ala. R. Civ. P., and they appealed.
On appeal, the Wigginses do not challenge the trial court's finding that they are neither public officials nor public persons. They also concede that Chief Mallard and East Brewton are entitled to a qualified privilege, and that, as to them, the Wigginses "bear the burden of proving defamation with actual malice." Ex parte Blue Cross, 773 So.2d at 478. As to Chief Mallard and East Brewton, they contend that the trial court erred in concluding that they failed to produce substantial evidence creating a genuine issue of material fact as to whether Chief Mallard's action constituted common-law malice.
As for Wallace and the Standard, however, the Wigginses contend that "the defense of qualified privilege is notapplicable." Wigginses' brief, at 27. This is so because, they argue, the qualified privilege discussed in Wilson applies only "when the news report at issue constitutes a fair and accurate report of the official investigation." Wigginses' brief, at 27. They contend that the testimony of Chief Mallard, namely, that he gave Wallace the correct information regarding the identity of the arrestee, if believed by a jury, would establish *Page 782 
that the publication by the Standard was not a "fair and accurate report" of the information provided by Chief Mallard. We first consider whether Wallace and the Standard are entitled to a qualified privilege as a matter of law.
 I. Wallace and the Standard
The standard by which this Court reviews a summary judgment is well settled:
 "Summary judgment is proper where there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Rule 56(c)(3), Ala. R. Civ. P. Once the movant shows that there is no genuine issue of material fact, the burden shifts to the nonmovant to present substantial evidence creating a genuine issue of material fact. In determining the propriety of a summary judgment, this Court reviews the evidence that was before the trial court when it entered the judgment and views that evidence in a light most favorable to the nonmovant."
Childersburg Bancorporation, Inc. v. Alabama Dep't of Envtl.Mgmt., 893 So.2d 1142, 1145 (Ala. 2004). "In order to defeat a properly supported motion for a summary judgment, the nonmoving party must present substantial evidence that creates a genuine issue of material fact." George v. Raine, 895 So.2d 258, 261
(Ala. 2004).
"Statements made subject to a qualified privilege are not actionable unless the plaintiff can prove that the defendant acted with [actual] malice." Atkins Ford Sales, Inc. v.Royster, 560 So.2d 197, 200 (Ala. 1990). If the plaintiff in a defamation action is a private person and the publication is not privileged, then "the plaintiff must prove by a preponderance of the evidence that the defendant was negligent in making the statement." Mead Corp. v. Hicks, 448 So.2d 308, 313 (Ala. 1983); cf. Milkovich v. Lorain Journal Co., 497 U.S. 1, 14-17,110 S.Ct. 2695, 111 L.Ed.2d 1 (1990) (discussing the "constitutional evolution" of the plaintiff's burden of proof in a defamation action).
In Wilson, this Court construed for the first time Ala. Code 1975, § 13A-11-161, which provides: "The publication of a fair and impartial report of . . . the arrest of any person for any cause . . . or of any investigation . . . shall be privileged, unless it be proved that the same was published with actual malice. . . ." Wilson was a defamation action by a private person, based on publication in the media of "statements made by two Cuban refugees to the Birmingham Police Department in the course of an official investigation and summarized in the official police incident report." 482 So.2d at 1213. It was undisputed that the report was "a fair and accurate" account of the statements. Id. Consequently, this Court held that the publication was privileged.
In doing so, the Court explained that § 13A-11-161 is an "explicit statutory privilege protecting fair and accurate reports of criminal charges and official investigations."482 So.2d at 1211. The Court stated:
 "[Section 13A-11-161] is a codification of the common law as reflected in the Restatement (Second) of Torts, § 611 (1977): `The publication of defamatory matter concerning another in a report of an official action or proceeding or of a meeting open to the public that deals with a matter of public concern is privileged if the report is accurate and complete or a fair abridgment of the occurrence reported.'
". . . .
 "In short, the news report at issue is [qualifiedly] privileged because it accurately reports statements made by the Cuban refugees during an official police *Page 783 
investigation, as reflected in the official police incident report."
482 So.2d at 1211-12 (emphasis added). Thus, the application of the privilege turns on whether the alleged defamatory statement was an accurate, or "substantially accurate,"482 So.2d at 1213, publication of the report of the arrest.
Ordinarily, "[t]he determination of whether a statement is privileged is a question of law for the trial judge." AtkinsFord Sales, Inc., 560 So.2d at 200. However, the application of the privilege in this case turns specifically on the credibility of Wallace and of Chief Mallard, whose versions of their August 8, 2000, telephone conversation are in direct conflict.
It is axiomatic that the credibility of witnesses is a matter within the exclusive province of the jury. Floyd v. Broughton,664 So.2d 897, 900 (Ala. 1995); Mayben v. Travelers Indem. Co.,273 Ala. 643, 645, 144 So.2d 52, 54 (1962); Dixon v. Davis,823 So.2d 1275, 1281 (Ala.Civ.App. 2001). If a jury were to believe
Chief Mallard, it must necessarily disbelieve Wallace. Specifically, the jury must conclude that, in fact, Chief Mallard told Wallace that the arrestee was Clinton Keith Wiggins, not Raymond Wiggins. In that event, it must conclude that the publication made by Wallace and the Standard was not accurate and, therefore, was not privileged. Under these facts, we cannot say that Wallace and the Standard are entitled to a qualified privilege as a matter of law. The trial court erred, therefore, in entering a summary judgment for Wallace and the Standard. We next consider whether the Wigginses have presented substantial evidence of actual malice as to Chief Mallard.
 II. Actual Malice
The Wigginses challenge the proposition that a "qualified privilege protect[s] defendants in a defamation action where there is substantial proof that . . . one of the defendants (only a jury can determine which), intentionally published a false report that one of the plaintiffs . . . had been arrested on a marijuana charge." Wigginses' brief, at 20. Chief Mallard and East Brewton contend that, because they are indisputably entitled to a qualified privilege, the Wigginses must present substantial "evidence of prior ill will, hostility, threats or other actions tending to show an intent to harm them, or that [Chief] Mallard had used violence in his language or mode of publication to show actual malice." Brief of Chief Mallard and East Brewton, at 17 (citing Warren v. Birmingham Bd. of Educ., 739 So.2d 1125
(Ala.Civ.App. 1999)). That principle is also embodied in AlabamaPattern Jury Instructions: Civil 23.13 (2d ed. 1993), which states:
 "Because the statement that is complained of is protected by [qualified] privilege, you can find for the plaintiff only if the plaintiff proves to your reasonable satisfaction from the evidence that the defendant made the statement with common-law malice — that is, with ill will or spite, as shown by evidence of previous ill will, hostility, threats, other actions, former libels or slanders, or by the violence of the defendant's language, the mode and extent of publication, and the like."
For reference purposes only, that principle will hereinafter be referred to as "the APJI formulation."[2]
The Wigginses respond that "malice is implicit in a lie." Wigginses' brief, at 19. *Page 784 
They contend that common-law malice may also be demonstrated by evidence indicating that the "`defamatory statements [were] made with reckless disregard of whether they [were] false.'" Id.
(quoting Barnett v. Mobile County Pers. Bd., 536 So.2d 46, 54
(Ala. 1988) (defamation based on a reckless disregard of whether the statement was false is hereinafter referred to as "theBarnett formulation")). They correctly point out that neither Chief Mallard nor Wallace concedes having misspoken and that "the only conclusion from their respective positions is that one of them [was] lying." Wigginses' brief, at 19 (emphasis added). The Wigginses' theory of the case is that the testimony of one of these defendants, denying that the mention of Raymond Wiggins's name in connection with the arrest originated with him, is substantial evidence that the other defendant is lying. In other words, the Wigginses contend that the testimony of each defendant forms the basis of liability with respect to the other.
The Wigginses do not argue that there is evidence of malice under the APJI formulation. Thus, the dispositive issue is whether a private plaintiff in a defamation action may overcome a qualified-immunity defense solely with testimony tending to show that the defendant intentionally lied about the plaintiff. The question, stated differently, is whether evidence of a deliberate lie constitutes substantial evidence of common-law malice. This precise issue has never been directly addressed by this Court. The resolution of the question requires a brief review of common-law malice in Alabama caselaw, and a comparison of common-law malice with the doctrine of "constitutional malice" set forth in New York Times Co. v. Sullivan, 376 U.S. 254,84 S.Ct. 710, 11 L.Ed.2d 686 (1964).
 A. Common-law malice
At common law, "[e]very defamatory publication, whether expressed by words, spoken or by writing . . . imputing to any person that . . . which is calculated to make him infamous . . . or ridiculous, prima facie implies malice in the . . . publisher . . ., and proof of malice [was] not in such cases . . . required . . . beyond the proof of the publication itself." Martin L. Newell, The Law of Slander and Libel § 342, at 381 (4th ed. 1924). In Alabama, punitive damages were recoverable upon proof of actual, or express, malice. Lee v. Crump, 146 Ala. 655,659, 40 So. 609, 610 (1906).
The common law of this state has long recognized that "[w]ords, calumnious in their nature, may be deprived of their actionable quality by the occasion of the utterance or publication. When this is the case, they are called in the law of defamation privileged communications. These communications are either absolutely or [qualifiedly] privileged." Lawson v. Hicks,38 Ala. 279, 284 (1862) (emphasis added). "When they are [qualifiedly] privileged, the law simply withdraws the legal inference of malice, and gives a protection upon the condition, that actual malice, or express malice, or malice in fact, (as the same idea is variously phrased,) is not shown." Id. When the defendant interposes a qualified privilege, "the plaintiff must plead defamation with actual [common-law] malice and bears the burden of proving defamation with actual [common-law] malice."Ex parte Blue Cross, 773 So.2d at 478 (emphasis added).
Common-law malice "implies a desire and intention to injure. . . . that is, that the defendant was actuated by ill-will in what he did and said, with a design to causelessly or wantonly injure the plaintiff." Newell, supra, § 277, at 315. "[T]his malice in fact, resting as it must upon the libelous matter itself and thesurrounding circumstances tending to *Page 785 prove fact and motive, is a question to be determined by the jury." Id. (Emphasis added.) Common-law malice focuses on the defamation defendant's attitude toward the plaintiff or a third party, that is, the defendant's motive to publish a falsehood.Konikoff v. Prudential Ins. Co. of America, 234 F.3d 92, 99 (2d Cir. 2000); Clemente v. Espinosa, 749 F.Supp. 672, 682 (E.D.Pa. 1990); Norton v. Glenn, 797 A.2d 294, 299 (Pa.Super. 2002); M. Newell, supra, §§ 271-77; John E. Hallen, Character of BeliefNecessary for the Conditional Privilege in Defamation, 25 Ill. L.Rev. 865, 866 (1931).
In Phillips v. Bradshaw, 167 Ala. 199, 210, 52 So. 662, 666
(1910), this Court stated, albeit in dicta, that a jury charge to the effect that the marking of a statement with knowledge ofits falsity is "conclusive evidence of malice" correctly stated the law. (Emphasis added.) A similar, but narrower, statement appeared later in Kenney v. Gurley, 208 Ala. 623,626, 95 So. 34, 37 (1923), where the Court said: "`[P]roof that [the] defendant knew [the statement] was untrue when he made it would be evidence of malice.'" (Emphasis added) (quoting Newell, The Law of Slander and Libel § 398 (3d ed. 1914)), overruled on other grounds, Ex parte Blue Cross,773 So.2d at 478.
In Johnson Publishing Co. v. Davis, 271 Ala. 474, 487,124 So.2d 441, 450 (1960), released four years before the United States Supreme Court decided New York Times v. Sullivan, this Court stated: "Malice, actual or expressed, may be shown by evidence of hostility, rivalry, the violence of the language, the mode and extent of publication, including the recklessness ofthe publication and prior information regarding its falsity." (Emphasis added.) This statement was not dicta, because Davis
involved an award of punitive damages. Additionally, the Court based its holding solely on evidence showing that a statement regarding a charge against the plaintiff was published, despite the publisher's knowledge that "the charge against [the defamation plaintiff] was uninvestigated and possibly false."271 Ala. at 486, 124 So.2d at 449.
In Barnett, 536 So.2d at 54, this Court stated clearly, albeit again in dicta: "Common law malice also includes defamatory statements that are `made with knowledge that theyare false or made with reckless disregard of whether they arefalse.'" (emphasis added) (quoting Prudential Ins. Co. ofAmerica v. Watts, 451 So.2d 310, 313 (Ala.Civ.App. 1984)). See also Hayes v. Wal-Mart Stores, Inc., 953 F.Supp. 1334, 1341
(M.D.Ala. 1996) ("Common law malice also includes defamatory statements made with knowledge of their falsity or with reckless disregard as to whether they are false."); Lewis v. Ritch,417 So.2d 210 (Ala.Civ.App. 1982). See generally Restatement(Second) of Torts § 600 (1977), which states:
 "Except as stated in § 602, one who upon an occasion giving rise to a [qualified] privilege publishes false and defamatory matter concerning another abuses the privilege if he
"(a) knows the matter to be false, or
 "(b) acts in reckless disregard as to its truth or falsity."
Common-law malice and the methods of proving it differ in a number of important respects from the "constitutional malice" established by New York Times v. Sullivan.
 B. Constitutional malice
This species of malice arises under the First Amendment of the United States Constitution, not under the common law, and is, therefore, properly called "constitutional malice." The threshold inquiry is whether the plaintiff in the defamation *Page 786 
action is a "public official or public or private figure."Mobile Press Register, Inc. v. Faulkner, 372 So.2d 1282, 1284
(Ala. 1979). This is so, because Sullivan "and its progeny mandate that no public [official or] figure may recover compensatory or punitive damages for libel unless actual malice as defined in Sullivan is proved: a publication made with actual knowledge of its falsity or made with reckless disregardof its truth or falsity." 372 So.2d at 1284 (emphasis added).
"As defined . . . in Sullivan, [`actual malice'] connotes neither the common meaning of `malice' nor the meaning attached to it in other areas of the law." 372 So.2d at 1284 n. 5. "Common-law malice" and "constitutional malice" constitute two distinct species of malice, Duffy v. Leading Edge Prods., Inc.,44 F.3d 308, 313 (5th Cir. 1995), and proof of constitutional malice is not made merely by proof of common-law malice. Elderv. Gaffney Ledger, 341 S.C. 108, 114, 533 S.E.2d 899, 902
(2000). Constitutional malice must be shown by clear and convincing evidence. Smith v. Huntsville Times Co.,888 So.2d 492, 499 (Ala. 2004). While constitutional malice "focuses on the defendant's attitude toward the truth or falsity of hispublished material," common-law malice focuses generally "on the defendant's attitude toward the plaintiff." Gomes v. Fried,136 Cal.App.3d 924, 934, 186 Cal.Rptr. 605, 611 (1982) (emphasis added).
The similarity in terminology is deceptively superficial. For these reasons, the two definitions have "caused a considerable amount of confusion and ambiguity in interpretation and application of the two different standards of malice." Fulton v.Advertiser Co., 388 So.2d 533, 538 (Ala. 1980).
Unfortunately, our cases have not always explained the means of proving common-law malice as methodically or as fully as they could have. At times, the Court has stated that proof could consist, not only of evidence of "previous ill will, hostility, threats, other actions, former libels or slanders, or by the violence of the defendant's language, the mode and extent of publication, and the like" — the APJI formulation — but also of "knowledge that [the statements were] false or made with reckless disregard of whether they [were] false" — the Barnett
formulation. See Johnson Publ'g Co. v. Davis, 271 Ala. at 487,124 So.2d at 450; Kenney v. Gurley, 208 Ala. 623, 626,95 So. 34, 37 (1923). At other times it has cited only the APJI formulation. See, e.g., Delta Health Group, Inc. v. Stafford,887 So.2d 887 (Ala. 2004); Nelson v. Lapeyrouse Grain Corp.,534 So.2d 1085, 1095 (Ala. 1988); Webster v. Byrd,494 So.2d 31, 36 (Ala. 1986); Fulton, 388 So.2d at 538. Curiously, these latter cases rely on Kenney, which, in fact, recognized both
formulations.
We tacitly acknowledged the Barnett formulation in a recent defamation action by Karen Brackin, a former employee of Family Security Credit Union ("FSCU"), against, among others, Jo Lynn Rutledge, "a certified public accountant employed [by] the Alabama Credit Union League." Brackin v. Trimmier Law Firm,897 So.2d 207, 209 (Ala. 2004). The dispute in Brackin began when an audit of FSCU identified "potential lending violations and other improprieties" connected with Mitchell Smith, a former employee of FSCU. Id. Rutledge was employed to investigate the possible violations. 897 So.2d at 209.
During her investigation, Rutledge discovered "that the due dates on several loans originated by Smith had been `advanced.'"897 So.2d at 210. In connection with that discovery, she interviewed a number of Brackin's co-employees. 897 So.2d at 210. Her investigation and interviews culminated in a written report to her *Page 787 
employer, in which she criticized Brackin and implicated her in the improprieties. 897 So.2d at 210-11. Matters addressed in the report were also discussed at a meeting before the Alabama Credit Union Administration ("the ACUA"). 897 So.2d at 215.
In Brackin's defamation action, the trial court entered a judgment as a matter of law for Rutledge. 897 So.2d at 217. On the appeal of that judgment, Brackin relied on the knowledge factor as set forth in Barnett. 897 So.2d at 225. More specifically, she argued that Rutledge failed "to investigate the accuracy of [Brackin's co-employees'] statements" to Rutledge, which, she argued, was evidence that Rutledge's statements before the ACUA were "`"made with reckless disregard of whether they [were] false."'" 897 So.2d at 225 (quoting Barnett, quoting in turn Prudential Ins. Co. of America, 451 So.2d at 313).
This Court affirmed the judgment. In our analysis, we first concluded that "Brackin did not present substantial evidence showing that Rutledge acted with actual malice" under the APJI formulation. 897 So.2d at 224. We went further, however, and also found "no evidence to indicate that Rutledge knew that any of the statements made in her report were false or that she acted with reckless disregard of their falsity." 897 So.2d at 225.
We employed a comparable analysis in Delta Health Group, Inc.v. Stafford, supra, which involved a qualified privilege asserted by Delta Health Group, Inc. ("Delta"), in a defamation action against it commenced by Tim Stafford and Lana Stafford.887 So.2d at 895. The Staffords alleged that Delta had filed an insurance claim that falsely accused Tim Stafford of pilfering building materials for use on the Staffords' personal residence from a nursing home owned and operated by Delta.887 So.2d at 890-91.
In holding that Delta's qualified privilege did not entitle it to a judgment as a matter of law on the Staffords' claims, we quoted the APJI formulation. However, we cited no evidence of "previous ill will, hostility, threats, rivalry, other actions, former libels or slanders and the like." Instead, we focused on the extent of the investigation conducted by Delta and the basis for its assumptions that Tim Stafford was responsible for the missing materials, and held that there was substantial evidence of common-law malice. 887 So.2d at 897.
In reality, evidence needed to establish constitutional malice and common-law malice "overlap[s] significantly." Paul v. HearstCorp., 261 F.Supp.2d 303, 306 (M.D.Pa. 2002). It overlaps insofar as the same evidence bears both on the defendant's motive, for purposes of common-law malice, and on the defendant's "attitude toward the truth or falsity of his publishedmaterial," Gomes v. Fried, 136 Cal.App.3d at 934, 186 Cal.Rptr. at 611, for purposes of constitutional malice. Indeed, "evidence that the defendant failed to determine whether or not his or her statements were grounded in fact is probative of whether common-law malice motivated the statements, since disregard of the truth may suggest that ill will and hostility were actually at work." Marshall v. Planz, 13 F.Supp.2d 1246, 1253 n. 16 (M.D.Ala. 1998). The failure of our cases to cite consistently the Barnett formulation does not deprive that formulation of its value as proof of common-law malice.
In this case, we are not asked to hold, and we do not hold, in accord with the dicta in Phillips v. Bradshaw, supra, that the making of a statement with knowledge of its falsity is"conclusive evidence of malice." (Emphasis added.) Neither are we asked to decide whether a qualified *Page 788 
privilege may be dissolved by proof of constitutional malice asan alternative to proof of common-law malice.[3] We do
hold, however, consistent with statements in our cases, indicta and otherwise, that a private-party-defamation plaintiff may overcome a qualified-immunity defense with testimony indicating that the defendant intentionally lied about the plaintiff. Thus, common-law malice may be shown, not only by "evidence of hostility, rivalry, the violence of the language, the mode and extent of publication," but, also, by proof of "the recklessness of the publication and prior information regarding its falsity." Davis, 271 Ala. at 487, 124 So.2d at 450.
Both Chief Mallard and Wallace were acquainted with Raymond Wiggins at the time the article was published in theStandard,[4] and neither defendant testified that he identified a "Raymond Wiggins" by mistake. In that connection Wallace testified as follows:
 "Q. [By Wigginses' counsel:] So is it your testimony, as I understand it, that Chief Mallard gave you Raymond Wiggins's name as having been arrested?
"A. [By Wallace:] Yes.
 "Q. And then you asked him whether this was the Raymond Wiggins that ran for county commissioner and he said, `I don't know'?
 "A. I asked — I said: `Is this — or is he related to the man that just ran for office?' And he said: `I don't know.'
"Q. Okay. And then you asked for his address?
"A. Correct.
"Q. And he gave you —
 "A. Appears to be 2474, or two-something, 74 Bradley Road."
(Emphasis added.)
Chief Mallard, on the other hand, testified as follows:
 "Q. [By Wigginses' Counsel:] Well, can you tell me what information you read to [Wallace] from [the police report of the arrests]?. . . .
 "A. [By Chief Mallard:] I told him that we had a drug bust over the weekend — which was, you know, Friday prior to me talking to him — and that we arrested three subjects for possession of drug paraphernalia and possession of marijuana. And in turn I told him that — who it was and gave him an address on each one.
"Q. So the addresses came from you, is that correct?
"A. The addresses that I gave him, yes, they did.
 "Q. Well, can you just tell me the name that you gave to him?
 "A. I gave him Clinton Keith Wiggins . . . Brewton, Alabama. . . .
 "Q. Do you recall any questions that Mr. Wallace asked you about this story or this arrest or any of this information?
"A. I don't recall any.
". . . .
 "Q. Do you recall Mr. Wallace asking you if one of the people named was named Raymond Wiggins?
"A. No. No way.
". . . .
 "Q. Do you recall Mr. Wallace asking you if the Raymond Wiggins that was *Page 789 
arrested was the Raymond Wiggins who ran for office?
 "A. If you notice what I said, I didn't say Raymond Wiggins was arrested.
 "Q. So it's your testimony that you did not say Raymond Wiggins —
"A. No. I did not."
(Emphasis added.)
Both testimonies cannot be true. The unequivocal testimony of each defendant is substantial evidence of the untruthfulness of the other's testimony. It is within the exclusive province of the jury to determine which version is true. The APJI formulation is incomplete in a case such as this one, which involves substantial evidence of a deliberate falsehood on the part of one or the other of two defendants.
 III. Summary
For the reasons discussed, the trial court erred in entering a summary judgment in favor of Wallace, the Standard, Chief Mallard, and East Brewton. That judgment is, therefore, reversed, and the cause is remanded for further proceedings consistent with this opinion
REVERSED AND REMANDED.
NABERS, C.J., and HOUSTON, LYONS, and JOHNSTONE, JJ., concur.
[1] The street number "2724" instead of "2474" was an error; that error is of no consequence in this case.
[2] See this Court's order of April 19, 1973, approving the use of these pattern jury instructions, and providing that "their use by the trial judges of this state are recommended, but without prejudice to the rights of any litigant to make and reserve for review any objection thereto either as to form, substance or application."
[3] The Wigginses do not contend that they have presented substantial evidence creating a genuine issue of material fact as to constitutional malice.
[4] There is no evidence indicating that either defendant knewJohn Wiggins.