[Nos. D011490, D011534. Fourth Dist., Div. One. June 27, 1991.]

NAOMI O'HARA, Plaintiff and Appellant, v.
STORER COMMUNICATIONS, INC., et al., Defendants and Appellants.

1102

## COUNSEL

Robert C. Swanson for Plaintiff and Appellant.

Higgs, Fletcher & Mack, John Morris and Jeffrey R. Davis for Defendants and Appellants.

## OPINION

**TODD, J.**—In this consolidated appeal arising from a lawsuit against Storer Communications, Inc. (Storer), which at the time owned television Channel 39 and was operating the station under the call letters of KCST-TV, San Diego, we consider the issue of special damages in defamation actions. Naomi O'Hara sued Storer for slander, and, in a trial limited to special damages, a jury awarded her $300,000. Storer appeals, claiming (1) O'Hara presented no evidence of special damages under the Restatement Second of Torts and evidence of emotional distress was improperly admitted during the trial and (2) therefore, the verdict was excessive and the result of passion and prejudice. O'Hara also appeals, contending (1) it was error to restrict the trial to special damages on the basis she failed to make an adequate demand for a retraction pursuant to Civil Code[1] section 48a and (2) she is entitled to prejudgment interest.

### FACTS

On October 12, 1983, Channel 39 broadcast a news report that named O'Hara as "an alleged prostitute" in the company of then-San Diego County Supervisor Paul Eckert. O'Hara in fact was not a prostitute; rather, she was a witness in a grand jury investigation of police involvement in a prostitution ring. The Channel 39 reporter made the error after reading a newspaper article about the grand jury investigation and transposing O'Hara's name with that of the alleged prostitute.

---

[1]All statutory references are to the Civil Code unless otherwise specified.

At the time, O'Hara was 44 years old and a free-lance public relations person, who had moved to California in the late 1970's from Kentucky, where she had volunteered in a wide spectrum of community activities. After living for a time in Los Angeles, she moved to San Diego and, in the early 1980's, embarked on a career in promotions and marketing, working at various times for Seaport Village, Agua Caliente Race Track and Marina Village. She was paid $1,200 to $1,500 a month by Seaport Village, $600 a week by Agua Caliente and $2,000 for the first month by Marina Village and $750 a month thereafter.

On November 2, 1983, O'Hara's attorney wrote Channel 39 and requested he be contacted so that a retraction could be discussed. The letter said in part: "I want a retraction published, but ONLY after it has been discussed first with me." On November 3, 1983, the television station's attorney telephoned O'Hara's attorney and it was agreed the station would send O'Hara's attorney transcripts of various broadcasts aired by the station pertaining to O'Hara for his review. The transcripts were sent by Federal Express the following day. The next communication between the attorneys took place on November 15, 1983, when O'Hara's attorney returned a previously placed telephone call. The station's attorney asked whether O'Hara's attorney had a proposed retraction; O'Hara's attorney responded that he needed to discuss the matter with his client. On December 7, 1983, the station's attorney telephoned O'Hara's attorney, who said he would call back. Neither the station nor its attorney heard from O'Hara or her attorney again until August 13, 1984, when O'Hara's attorney sent a letter demanding compensation in the amount of $2.5 million.

On October 12, 1984, O'Hara filed her complaint, stating four different causes of action: defamation, intentional infliction of emotional distress, negligence and invasion of privacy. The complaint alleged that Channel 39's broadcast of October 12, 1983, was slanderous because "it imputed to [O'Hara] the reference of being charged with a crime and a want of chastity."[2]

On July 7, 1988, the trial court granted summary adjudication in favor of Storer, finding (1) O'Hara had failed to comply with section 48a in making a proper demand for correction and (2) Storer did not refuse to make a correction.

Trial commenced on October 10, 1989. In response to a series of motions *in limine,* the trial court made the following rulings: (1) Because of the

---

[2]The complaint also alleged Channel 39's broadcast of October 14, 1983, was defamatory because "the language can be construed and is understood to mean that an officer gave testimony in a prostitution case against [O'Hara]."

previous adjudication that O'Hara had not complied with the retraction statute, she could not present evidence of general damages; (2) O'Hara could not present evidence of loss of reputation, hurt feelings and depression; (3) O'Hara could present psychiatric testimony regarding her inability to work, with the court specially instructing the jury that it cannot consider the testimony for the purposes of assessing emotional distress damages; (4) O'Hara could present up to three witnesses on the subject of professional capabilities before the slander.

The witnesses who testified at trial included the following: Alana Cravens, a friend from Kentucky, testified that O'Hara successfully organized a host of civic, community and charitable functions in Kentucky on a volunteer basis. Cravens, who also relocated to San Diego, said she was interested on her arrival in October 1983 in hiring O'Hara to help her promote a new interior design business, but O'Hara was not able to work for her in such a capacity. Cravens, who also works in real estate, said that she continued to try to get O'Hara to work for her as an assistant but O'Hara refused. "She cannot face the public," Cravens said. "She helps me in ways from her home, stuffing envelopes, doing mailings, that kind of thing."

In another part of her testimony, Cravens described the condition in which she found O'Hara when she arrived in San Diego on October 13, 1983, the day after the slanderous broadcast. When O'Hara did not pick her up at the airport, as they had arranged, Cravens proceeded to O'Hara's apartment where she found O'Hara being at "a point of hysteria," and "hiding behind a chair and shaking and couldn't even talk." The trial court granted the defense motion to strike the testimony about "a point of hysteria," but eventually allowed the testimony about hiding behind a chair to remain in the record. On the basis of Cravens's testimony, Storer moved for a mistrial, which was denied.

Dr. Haig Koshkarian testified that the broadcast had caused O'Hara to suffer from posttraumatic stress syndrome and had left her disabled. Koshkarian said O'Hara had become guilt-ridden, frightened, hypersensitive, suicidal, manic depressive and utterly incapable of performing a job outside the home. O'Hara incurred medical bills of approximately $9,000 from Koshkarian; however, this amount had not been paid. Koshkarian's testimony about O'Hara's emotional state was the subject of numerous defense objections.[3]

Bruce Riley McDaniel, marketing director of Crown Cruise Lines, testified by way of deposition that he interviewed O'Hara in 1984 for a sales

---

[3]Storer also objected to O'Hara's brother testifying about his sister having repeated nightmares caused by the broadcasts, as well as O'Hara's testimony about her depressions, attempted suicides, and general inability to cope with daily life.

position but did not hire her because she did not appear confident during the interview. McDaniel said "she didn't look good," "was emaciated," "had what I would consider a shake . . . to her hands, and I think that there was something wrong with her mentally." McDaniel said at the time of the interview he was aware of the media reports concerning O'Hara's involvement with grand jury investigation. O'Hara testified that McDaniel gave her the following reason for not hiring her: "[H]e said I didn't look good and—and that I was too shaky and I wasn't concentrating, and—and he told me about the adverse publicity about me." McDaniel, in his deposition testimony said, he did not give O'Hara a reason for not hiring her. However, he said had it not been for how she presented herself at the time, "She would have been a strong candidate."

Dan McGreary, a property manager, hired O'Hara in December 1982 to do marketing for Marina Village and was pleased with her performance. McGreary testified in October 1983 he was interested in hiring O'Hara to promote Rancho San Diego but his efforts to contact her were unsuccessful. He also testified he was aware of the media reports concerning O'Hara's involvement with the grand jury investigation and that knowledge did not dissuade him from wanting to hire her: "[I]t didn't mean anything to me. I didn't believe it, so it didn't dissuade me." McGreary testified that in 1983 the salary for a marketing director for a regional shopping center would have been either $45,000 or $50,000 a year.

Charles Timothy Maloney, who was chief executive officer of Kings Daughters Medical Center in Ashland, Kentucky, offered O'Hara a job as assistant director of community relations in 1985 at a salary between $45,000 and $50,000 a year. O'Hara, however, did not report for work and when contacted by Maloney, said she had some problems and could not take the job at that time. O'Hara testified she did not go to work at the medical center "[b]ecause I couldn't get myself together emotionally. I lost all my confidence . . . ." Maloney testified in 1985 he was not aware of the media reports concerning O'Hara's involvement with the grand jury investigation. He said if he had known, it would have affected his offering her a job.

Michael Wood, a management consultant, testified that in 1984 he tentatively offered O'Hara a $50,000-a-year job as marketing director for an alcohol rehabilitation center, pending funding of the project. In 1986, Wood testified, when he attempted to contact O'Hara to begin work, he was told she was ill and not available. Wood also testified that had he been aware of the media reports concerning O'Hara's involvement with the grand jury investigation, he would not have offered the position to O'Hara. Wood said he and his wife had been impressed with O'Hara's work in 1983 for the

Pasadena Council on Alcoholism when she completed a two-day assignment for which she was paid $500.

O'Hara also testified that in 1985 she was offered a job at a tennis club in Albuquerque, New Mexico, but did not accept it because she wanted to be near her psychiatrist and she was afraid that people from San Diego might recognize her.

During her testimony, O'Hara presented as exhibits two calendars of her business activities for 1982 (exhibit 4) and 1983 (exhibit 3), which were full of daily entries until October 13, 1983. O'Hara testified after that date, "Nobody called me ever again after that about any type of work."

## DISCUSSION

Central to both appeals is section 48a, which reads in pertinent part as follows:

"1. In any action for damages for the publication of a libel in a newspaper, or of a slander by radio broadcast, plaintiff shall recover no more than special damages unless a correction be demanded and be not published or broadcast, as hereinafter provided. Plaintiff shall serve upon the publisher, at the place of publication or broadcaster at the place of broadcast, a written notice specifying the statements claimed to be libelous and demanding that the same be corrected. Said notice and demand must be served within 20 days after knowledge of the publication or broadcast of the statements claimed to be libelous.

"2. If a correction be demanded within said period and be not published or broadcast in substantially as conspicuous a manner in said newspaper or on said broadcasting station as were the statements claimed to be libelous, in a regular issue thereof published or broadcast within three weeks after such service, plaintiff, if he pleads and proves such notice, demand and failure to correct, and if his cause of action be maintained, may recover general, special and exemplary damages; provided that no exemplary damages may be recovered unless plaintiff shall prove that defendant made the publication or broadcast with actual malice and then only in the discretion of the court or jury, and actual malice shall not be inferred or presumed from the publication or broadcast.

". . . . . . . . . . . . . . . . . . . . . . . .

"4. As used herein, the terms 'general damages,' 'special damages,' 'exemplary damages' and 'actual malice,' are defined as follows:

"(a) 'General damages' are damages for loss of reputation, shame, mortification and hurt feelings;

"(b) 'Special damages' are all damages which plaintiff alleges and proves that he has suffered in respect to his property, business, trade, profession or occupation, including such amounts of money as the plaintiff alleges and proves he has expended as a result of the alleged libel, and no other[.]"

The constitutionality of section 48a was upheld in *Werner v. Southern Cal. etc. Newspapers* (1950) 35 Cal.2d 121 [216 P.2d 825, 13 A.L.R.2d 252], with the Supreme Court finding the danger of excessive recoveries of general damages in defamation actions and the public interest in free dissemination of news justify the limitation of recovery for defamation to special damages when a retraction has not been demanded and refused.

I

We first consider O'Hara's contention that the trial court erred in finding she had failed to comply with section 48a and Storer had not refused to broadcast a correction.[4] The contention is without merit.

Whether O'Hara met the requirements of the statute is a question of law. (*Gomes v. Fried* (1982) 136 Cal.App.3d 924, 936 [186 Cal.Rptr. 605].) In *Farr v. Bramblett* (1955) 132 Cal.App.2d 36 [281 P.2d 372], overruled on other grounds in *Field Research Corp. v. Superior Court* (1969) 71 Cal.2d 110, 114, footnote 4 [77 Cal.Rptr. 243, 453 P.2d 747], the following telegram was deemed not to have met the requirements of a demand for a correction under section 48a:

" 'WE REPRESENT FREDERICK S. FARR AND HIS WIFE ABOUT WHOM YOU HAVE PUBLISHED FALSE, MALICIOUS AND LIBELOUS STATEMENTS. . . . THESE STATEMENTS . . . ACCUSE MR. FARR AND HIS WIFE OF COMMUNIST ACTIVITIES EACH WITHOUT FOUNDATION IN FACT. PERHAPS IN THE STRAIN OF YOUR CAMPAIGN, YOU DID NOT REALIZE THE SERIOUSNESS OF THESE CHARGES, CONSEQUENTLY AN OPPORTUNITY WILL BE AFFORDED AND DEMAND IS MADE UPON YOU INDIVIDUALLY AND AS A MEMBER OF THE BRAMBLETT COMMITTEE THAT YOU OR YOUR REPRESENTATIVE MEET IN OUR OFFICE BEFORE FIVE P.M. TODAY NOVEMBER 3RD TO ARRANGE FULL DETAILS OF IMMEDIATE AND SATISFACTORY AND FULL RETRACTION OF THESE FALSE AND LIBELOUS STATEMENTS. FAILING THIS, IMMEDIATE PRODEEDINGS WILL BE INITIATED.' " (*Farr, supra*, 132 Cal.App.2d at p. 40.)

---

[4]Contrary to Storer's contention, this matter is reviewable on appeal. (Code Civ. Proc., § 906.)

The Court of Appeal held the telegram in *Farr* did not demand a correction but demanded attendance at a meeting with plaintiff's counsel to arrange for a retraction. (*Id.* at p. 43.)

Similarly, here, the November 2, 1983, letter by O'Hara's counsel asked Channel 39 to contact him or have its counsel contact him "so that we may discuss the manner of retraction." While the letter by O'Hara's counsel goes on to state a retraction is desired, the letter emphasizes the retraction should be published "ONLY after it has been discussed first with me." It is uncontroverted that Channel 39 (1) immediately contacted O'Hara's counsel after receiving the November 2 letter, (2) sent O'Hara's counsel transcripts of the various broadcasts as he requested, (3) informed O'Hara's counsel it was prepared to air a retraction or correction as soon as he let the station know what form he wanted the retraction to take and (4) never heard from O'Hara's counsel on the specifics of the desired retraction.

We conclude the November 2, 1983, letter was a conditional request, with O'Hara controlling the conditions to be met. Channel 39 promptly indicated its willingness to broadcast a retraction and to meet O'Hara's conditions. However, neither O'Hara nor her counsel ever set those conditions, making it impossible for Channel 39 to comply with the conditional request for a retraction. Such a conditional request is not a demand in accordance with section 48a.

## II

Having established that O'Hara did not comply with section 48a in making a proper demand for retraction, it follows that under the statute she was limited to proving special damages at trial. Hence, we next consider Storer's assignments of error with respect to evidence of damages presented at trial: (1) O'Hara did not present any evidence of special damages; and (2) the trial court improperly allowed evidence of emotional distress to be presented to the jury.

Subdivision 4(b) of section 48a defines special damages as follows:

"[A]ll damages which plaintiff alleges and proves that he has suffered in respect to his property, business, trade, profession or occupation, including such amounts of money as the plaintiff alleges and proves he has expended as a result of the alleged libel, and no other; . . ."

O'Hara presented three types of evidence concerning the damage to her livelihood: (1) she suffered a loss of clients unexplained by any other source; (2) McDaniel was concerned over the adverse publicity concerning O'Hara;

and (3) the defamation caused a psychic injury that incapacitated her, rendering her unable to work, giving McDaniel a reason for failing to hire her.

■ It is clear that under California law, a loss of clients following defamation is evidence of recoverable special damages. (See *MacLeod* v. *Tribune Publishing Co.* (1959) 52 Cal.2d 536, 548 [343 P.2d 36]; *Kanarek* v. *Bugliosi* (1980) 108 Cal.App.3d 327, 336-337 [166 Cal.Rptr. 526].) In *MacLeod*, a dentist alleged that as a result of a libel he " 'suffered pecuniary loss in his profession as a dentist' in that an 'unusually large percentage of old and established patients have been cancelling appointments,' and there 'has been a sharp decline in the number of new patients normally to be expected.' " The Supreme Court held this pleading sufficient to meet the statutory definition of special damages under section 48a. In *Kanarek*, an attorney sued the author of a book for defamation and included the following allegation of special damages in his complaint:

" '[P]laintiff has lost clients and there has been a sharp decline in the number of new clients normally to be expected by plaintiff and plaintiff's ability and eligibility to . . . attain public office, including but not limited to elevation to membership in the judiciary, has been impaired. . . .' " (*Kanarek* v. *Bugliosi, supra*, 108 Cal.App.3d at p. 336.) The Court of Appeal held that Kanarek's pleading of a reduction in the number of new clients and a loss of clients was a sufficient pleading of special damages for purposes of section 48a. (108 Cal.App.3d at p. 337.)

■ O'Hara presented evidence of such damages with her business calendars for 1982 and 1983 which chronicled substantial business activity before the slanderous broadcast and none whatsoever thereafter, as well as her testimony that after the slanderous broadcast she no longer received phone calls about work.

Next, we assess the effect of O'Hara's testimony that McDaniel told her the adverse publicity was part of his reason for not hiring her. While controverted by McDaniel's memory (as expressed in his deposition) that he gave O'Hara no reason for his decision not to hire her, this conflict was a question of fact to be assessed by the jurors and we cannot reweigh the evidence. We must give every intendment to any substantial evidence supporting the judgment. Since the jury considered evidence McDaniel told O'Hara the defamatory publicity influenced his decision not to hire her, we must presume such evidence was accepted as true. This evidence fits the classical definition of special damage in a defamation case—a business loss suffered by the plaintiff as a result of damage to her reputation. (See *Terwilliger* v. *Wands* (1858) 17 N.Y. 54; Rest.2d Torts, § 575, com. b

["Special harm must result from the conduct of a person other than the defamer or the one defamed, and must be legally caused by the defamation."].)

However, the question remains whether O'Hara's evidence that the defamation rendered her incapable of working constituted special damages under section 48a. ■ The distinction between general damages and special damages is universally recognized. General damages are damages that courts believe generally flow from the kind of substantive wrong done by the defendant. Special damages, on the other hand, include items of loss that are more or less peculiar to the particular plaintiff in that the plaintiff actually suffered the loss in the specific amount. Two limitations apply to special damages: (1) they must be proved to a reasonable certainty; and (2) no special damages are recoverable if they are deemed remote. ■ Here, we must consider the differences between general damages and special damages in the context of defamation actions and section 48a.

Storer argues that none of the witnesses presented by O'Hara (Cravens, Koshkarian, Maloney, Wood, and McDaniel) testified as to special damages because O'Hara's inability to work does not constitute special damages. In essence, McDaniel's deposition testimony was that he observed some of the effects of the defamation on O'Hara—the shaking of her hands and lack of confidence—and this observation was one reason he did not hire her.

Thus is posed a question never clearly decided by any court in California. May evidence of psychic injury or emotional distress be shown as the cause of special damage where one's business income is diminished because others became aware of the defamed plaintiff's condition? We conclude it may; contrary to Storer's argument, this conclusion does not conflict with the position of the Restatement Second of Torts.[5] Section 622A of the Restatement Second of Torts provides: "Defamation is a legal cause of special harm to the person defamed if (a) it is a substantial factor in bringing about the harm, and (b) there is no rule of law relieving the publisher from liability because of the manner in which the publication has resulted in the harm."

In several states outside this jurisdiction, it has long been established that a plaintiff's own distress or illness caused by the defamation cannot constitute special damages. (See, e.g., *Terwilliger* v. *Wands, supra,* 17 N.Y. 54.)

In a California defamation case, *Gomes* v. *Fried, supra,* 136 Cal.App.3d 924, 940, a libel case, the reviewing court examined the evidentiary record

[5]We note that parties have not cited any California case specifically adopting the Restatement position, nor has our research disclosed any.

to determine whether evidence of special damage supported a verdict for Gomes:

"Here, Gomes admitted that he suffered no out-of-pocket losses as a result of the Observer article; he lost no time from work, incurred no medical or other bills, and no economic loss in his employment." Thus, the value of lost time at work, medical expenses attributable to the defamation, and other economic losses in one's employment were implicitly considered to be special damages. In the absence of any evidence to support such losses, the *Gomes* court found no proof of special damages.

Here, the testimony of Koshkarian, Cravens, Maloney, and Wood corroborated McDaniel's observations. O'Hara could not handle the job he had offered her. Admission of this testimony is cited as prejudicially erroneous. Storer argues this testimony merely presented evidence of general damages by describing the effects of the defamation on O'Hara's emotional stability, feelings and reputation. The trial court determined this testimony could not be considered for such a purpose here when it instructed the jury as follows:

"You have heard evidence in this case that plaintiff suffered hurt feelings, depression, and emotional distress because of defamatory statements made about her. This evidence was received for a limited purpose. Under the 'law of this case' plaintiff is not entitled to recover monetary damages for emotional distress in and of itself. Thus, any evidence of hurt feelings, depression, and emotional distress, was admitted only insofar as such evidence showed or tended to show, plaintiff was limited in her ability to work or was rendered incapable of working." According to established principles, we conclude the jury was conscientious in following the trial court's charge.

Through this special limiting instruction, the jurors were permitted to consider the questioned testimony only as corroboration of the fact that at least one potential employer (McDaniel) decided not to hire her as a direct result of the effects of the defamation. This testimony amply corroborated McDaniel's belief O'Hara was incapable of working and the defamation was the only cause shown for such inability. The limiting instruction given to the jury precludes any finding of error since the jury was effectively told not to consider this evidence except as it bore on special damages under section 48a.

While Storer argues the general law of defamation does not permit a plaintiff's emotional injury to bottom a claim of special damages, we are unpersuaded. Under the specific language of section 48a, one's loss of employment due to obvious emotional instability certainly results in a loss to "property, business, trade, profession or occupation" as set out in the statute. In O'Hara's case, substantial evidence supported the jury verdict she had

suffered monetary damage through inability to work as a direct and proximate result of the defamation. We have examined the history of the enactment of section 48a by the Legislature and of its amendment in 1945, and find nothing to indicate an intent to limit special damage as argued by Storer. Under the plain meaning of the unambiguous words of the statute, we hold O'Hara has proved special damages. Our conclusion is bolstered by the statement of the *Gomes* court (136 Cal.App.3d 924, 940) listing economic loss in one's employment and time lost from work as special damages in a defamation case. While the body of testimony on this subject may have been cumulative at trial, we find no error in its admission.

Restatement of Torts, Second, section 575, indicates the special harm for which liability attaches must be caused by conduct other than that committed by the defamer or the victim. Here, McDaniel's decision not to hire O'Hara clearly satisfied this requirement of the Restatement. Again, we have found no precedent in California law adopting the Restatement portion, but we treat the issue since Storer raises this point in its argument.

Storer argues traditional defamation law precludes recovery for any damage except that resulting from damage to reputation. What Storer ignores is the nature of section 48a: It is a retraction statute that eliminates general damages for failure to properly request a retraction. The purpose of a retraction is to restore the defamed person's reputation, thus eliminating the need for general damages, which are "damages for loss of reputation, . . ." (§ 48a, subd. (4)(a).) By eliminating general damages for failure to comply with the statute, section 48a precludes O'Hara from recovering for the damage to her reputation. However, it specifically authorizes recovery of specially proved damages to her "business, trade, profession, or occupation . . . ." (§ 48a, subds. (1) and (4)(b).)

Storer argues (incorrectly) the evidence shows only damage due to O'Hara's emotional distress and there remains no basis for any recovery whatever, completely ignoring O'Hara's evidence of lost clients as shown in her business diaries. It appears the trial court met Storer's argument by eliminating *any* basis for recovery of general damages. As mentioned above, pursuant to the trial court's limiting instruction, no damage was recoverable by O'Hara for hurt feelings, mental anguish or any other intangible damage caused by her injured reputation. We conclude nothing prevents her from recovering specially proved economic losses to her business when these losses resulted directly from her potential employer's conclusion the defamation had rendered her unable to perform the ordinary duties of her profession.

Further, concerning O'Hara's proved special damages, we note section 48a includes "such amounts of money as the plaintiff alleges and proves he has expended as a result of the alleged libel, . . ." ██ ██ The amounts incurred in O'Hara's treatment by Koshkarian were proved and not contested by Storer.[6] This type of special damage is not related to O'Hara's loss of reputation, but only to her psychological injury. Also, this type of special damage was one listed as recoverable under section 48a in *Gomes* v. *Fried, supra,* 136 Cal.App.3d 924. ██ We conclude, therefore, California has not followed the Restatement rule requiring any recoverable special damage to result only from the conduct of a third person.

## III

██ Storer contends the $300,000 verdict was excessive and there was insufficient evidence to justify it. The contention is without merit.

██ Our Supreme Court summarized the rules governing appellate review of a claim of excessive damages in *Seffert* v. *Los Angeles Transit Lines* (1961) 56 Cal.2d 498, 506-507 [15 Cal.Rptr. 161, 364 P.2d 337]:

"The amount of damages is a fact question, first committed to the discretion of the jury and next to the discretion of the trial judge on a motion for new trial. They see and hear the witnesses and frequently, as in this case, see the injury and the impairment that has resulted therefrom. As a result, all presumptions are in favor of the decision of the trial court [citation]. The power of the appellate court differs materially from that of the trial court in passing on this question. An appellate court can interfere on the ground that the judgment is excessive only on the ground that the verdict is so large that, at first blush, it shocks the conscience and suggests passion, prejudice or corruption on the part of the jury." ██ Regardless of O'Hara's past employment history, which as Storer points out indicates she never earned more than $36,000 a year, there was testimony from McGreary that she was qualified to assume the position of marketing director for a regional shopping center, a job that he said in 1983 would pay between $45,000 and $50,000 a year. Such a figure also represents the approximate salary of the jobs offered to O'Hara by Maloney and Wood. While there was no specific figure introduced with respect to the loss of income from the total drop-off of clients calling her, we find the testimony of Wood instructive on this point. Wood testified that in 1983 the Pasadena Council on Alcoholism paid O'Hara $500 for two days of work. Given this evidence and the six years between the slanderous broadcast and the trial, we find the $300,000 verdict

---

[6] The fact O'Hara has not paid Koshkarian's bill for treatment is of no moment. *Gomes, supra,* refers to the *incurring* of medical bills as within the California special damages rule in defamation actions. (136 Cal.App.3d at p. 940.)

is adequately supported by the record and reject the argument it is excessive and a result of passion.

## IV

█ O'Hara contends the trial court erred in denying her prejudgment interest under section 3291. The contention has merit.

Section 3291 permits the recovery of prejudgment interest in actions "to recover damages for personal injury sustained by any person resulting from or occasioned by the tort of any other person, corporation . . . ." The court's authority to make such an award is predicated on the plaintiff having made an offer under Code of Civil Procedure section 998 to settle the case which the defendant had not accepted before trial or within 30 days, whichever occurred first, and the plaintiff then obtaining a more favorable judgment. Here, O'Hara made a statutory settlement demand less than the judgment.

In *Morin* v. *ABA Recovery Services, Inc.* (1987) 195 Cal.App.3d 200 [240 Cal.Rptr. 509], this court held section 3291 mandates an award of prejudgment interest when the statutory conditions are met. In *Morin*, the jury returned a general verdict in favor of the plaintiff who had sought personal injury damages and other damages. We held section 3291 authorizes prejudgment interest *only* for the personal injury portion of a more general total recovery and remanded the case to the trial court to determine the amount of the verdict, if any, attributable to personal injury claims and award prejudgment interest accordingly.

In *Morin, supra,* we noted the legislative intent behind section 3291 was to encourage settlement and observed the Legislature was deliberately treating personal injury cases different from contractual or business-tort losses. "The Legislature intended different treatment of personal injury actions because of the manifest greater prejudice of delay in recovering personal injury damages as compared to contractual or business-tort losses given the probability personal injury plaintiffs are likely to be physically as well as monetarily impaired." (195 Cal.App.3d at pp. 206-207, fn. 1 [cited with approval in *Gourley* v. *State Farm Mut. Auto Ins. Co.* (1991) 53 Cal.3d 121, 126 (279 Cal.Rptr. 307, 806 P.2d 1342)].)[7]

Here, the issue presented is whether O'Hara's action for defamation is one "to recover damages for personal injury." We first look at the nature of the

---

[7]Since the only personal injury compensation sought in *Morin* was for emotional distress, the case cannot be interpreted as holding that personal injury within the context of section 3291 means physical injury.

tort. "[D]efamation is an invasion of the interest in reputation and good name. . . . [¶] A defamatory communication usually has been defined as one which tends to hold the plaintiff up to hatred, contempt or ridicule, or to cause him to be shunned or avoided. This definition is certainly too narrow . . . . Defamation is rather that which tends to injure 'reputation' in the popular sense; to diminish the esteem, respect, goodwill or confidence in which the plaintiff is held, or to excite adverse, derogatory or unpleasant feelings or opinions against him." (Prosser & Keeton, Torts (5th ed. 1984) § 111, pp. 771-773, fns. omitted.) A defamation claim thus seeks to vindicate decidedly personal interests. As such, defamation is a personal injury within the meaning of section 3291.

Our conclusion is bolstered when we consider out-of-state authority. In *Miller* v. *Carnation Co.* (1977) 39 Colo.App. 1 [564 P.2d 127], the court interpreted Colorado's prejudgment interest statute, which is similar to section 3291,[8] and made the following observations:

"An injury is personal when it impairs the well-being or the mental or physical health of the victim. . . . In contrast, an injury is not personal when inflicted on property. Therefore, interest on the award for annoyance and discomfort is recoverable from the date of the filing of the Millers' complaint." (564 P.2d at p. 132.)

In *Timmons* v. *Royal Globe Ins. Co.* (Okla. 1985) 713 P.2d 589, the Oklahoma Supreme Court was asked to decide "whether an award, characterized by the settled law of the case as one for 'embarrassment and mental suffering,' qualifies for prejudgment interest because it is for 'damages by reason of personal injuries' " within the meaning of the Oklahoma prejudgment interest statute. The court answered in the affirmative. "When recovery for mental harm is achieved by a tort case verdict, . . . there exists no legal impediment to viewing the award as one for 'personal injury.' In short, a jury's fixed-sum award for embarrassment and mental suffering does qualify for prejudgment interest authorized by [the statute], because it is for detriment to the person." (*Id.* at p. 593, fn. deleted.)

Storer contends O'Hara's verdict did not represent personal injury damages but rather property damages and therefore the trial court was correct in refusing to award prejudgment interest under section 3291. Storer argues that O'Hara, by virtue of her failure to adequately request a retraction under section 48a, was restricted to special damages and precluded from

[8]Subsection (1) of Colorado Revised Statutes section 13-21-101 provides in relevant part as follows: "In all actions brought to recover damages for personal injuries sustained by any person resulting from or occasioned by the tort of any other person . . . it is lawful for the plaintiff in the complaint to claim interest on the damages claimed from the date the action accrued."

recovering general damages under that statute. Given the definitions of special damages and general damages contained in section 48a, Storer claims O'Hara's award constituted compensation for property injuries. We are not persuaded. ■ Section 48a represents a legislative determination that the danger of excessive recoveries in defamation actions, as well as the public interest in free dissemination of news, justifies restricting recovery to special damages when a retraction has not been demanded and refused. (*Werner* v *Southern Cal. etc. Newspapers* (1950) 35 Cal.2d 121 [216 P.2d 825, 13 A.L.R.2d 252].) Section 48a has not changed the nature of the tort of defamation from a personal injury into a property injury, but rather has placed a limit on the type of damages that can be recovered if the plaintiff does not properly seek a retraction.

## DISPOSITION

The judgment is reversed insofar as it denied prejudgment interest. The matter is remanded to the superior court with directions that the judgment be amended to include prejudgment interest pursuant to section 3291. In all other respects, the judgment is affirmed.

Kremer, P. J., concurred.

**AMOS, J.,**[*] Dissenting.—While I concur with part I of the majority opinion, I disagree with the reasoning and conclusions in part II. The primary issue in part II is whether special damages, as defined in Civil Code[1] section 48a, subdivision (4)(b), includes loss of income from O'Hara's inability to work as a result of illness, depression or emotional distress caused by defamation. The majority concludes it does. I disagree and would reverse for the reasons set forth below.

Prior to the taking of evidence, the trial court ruled that it would allow testimony of O'Hara's emotional state and depression ". . . for the purpose of showing the plaintiff's inability to work." The court further clarified its position during trial when it stated, ". . . if they found a potential employer that says, 'Look, I wanted to hire this lady but I couldn't because of her disability,' that then proves special damages."

Numerous witnesses testified regarding O'Hara's inability to work. Dr. Koshkarian testified O'Hara had acute symptoms of anxiety and depression coupled with a lack of self-confidence. Cravens testified she initially found O'Hara shaking and hiding behind a chair. She stated she was in a depressed

---

[*]Judge of the Municipal Court for the San Diego Judicial District sitting under assignment by the Chairperson of the Judicial Council.

[1]All statutory references are to the Civil Code.

state and could not seem to function outside of the home. Maloney offered her a job and when she failed to report he contacted her. She seemed distraught and very depressed. She told him she was not in an emotional state which would allow her to accept the job offer. McDaniel testified that when he interviewed her for a job she had a shake, appeared emaciated, something was wrong with her mentally, and she had lost her self-confidence. For these reasons he did not hire her. Wood testified he offered her a job but was unable to contact her. O'Hara stated that as a result of the slander she became extremely depressed and was unable to face the public. O'Hara's evidence established she was unable to work because of the emotional and physical problems caused by the slander.

At the conclusion of the evidence, the trial court instructed the jury that ". . . any evidence of hurt feelings, depression, and emotional distress, was admitted only insofar as such evidence showed or tended to show, plaintiff was limited in her ability to work or was rendered incapable of working." Thus, the jury was told that in determining damages it could consider all of the evidence regarding her emotional state for the purpose of deciding if this was the reason she was unable to work.

The majority concludes this instruction was proper since "special damages" as defined in section 48a includes damages for loss of income resulting from emotional distress. This conclusion is contrary to traditional defamation law and is inconsistent with the Restatement Second of Torts. Further, while several states have adopted similar retraction statutes,[2] no case has extended special damages to cover loss of income resulting from emotional distress.

The law of defamation was developed to protect one's reputation. To recover damages plaintiff should first be required to establish injury to reputation through either presumption or proof. (Prosser & Keeton, Torts, (5th ed. 1984) § 116A, p. 844.)

The California retraction statutes eliminate general and exemplary damages when a plaintiff fails to demand a retraction. (*Pridonoff* v. *Balokovich* (1951) 36 Cal.2d 788, 791 [228 P.2d 6].) While these statutes severely limit the damages available to a plaintiff, they have been upheld as constitutional and are designed to prevent excessive damages and further the public interest in the free dissemination of news. (*Werner* v. *Southern Cal. etc. Newspapers* (1950) 35 Cal.2d 121, 126 [216 P.2d 825, 13 A.L.R.2d 252].)[3]

[2](See Ind. Code, §§ 34-4-14-1; 34-4-15-1 (1990); Iowa Code, §§ 659.2; 659.3 (1989); Ky. Rev. Stat., § 411.051 (1991); Neb. Rev. Stat., § 25-840.01 (1989); and Nev. Rev. Stat., §§ 41.331; 41.338 (1989).)

[3]Several states have held similar retraction statutes unconstitutional because they prevent many defamed plaintiffs from recovering damages for actual injuries and emotional suffering.

In his dissent in *Werner*, Justice Carter noted, "It is a rare situation where a plaintiff can trace and prove the special damage he has suffered from libelous matter printed in a newspaper or spoken over the radio about him. This does not mean that he may not have suffered sharply—but it does mean that he may never hear of business opportunities which would have been his *had the 'libelous stain' not appeared on his name plate.*" (*Id.* at p. 142, italics added.) Special damages are damages which a plaintiff suffers to his property, business, trade, profession or occupation caused by this "libelous stain" or injury to his reputation, not damages resulting from the plaintiff's emotional state.

Texts on defamation indicate special damages must flow directly from the injury to reputation and not from the effects of defamation such as illness. (Sack, Libel, Slander, and Related Problems (1980) § VII.2.2., pp. 345-346.) Mental distress, even if it results in physical illness, is not sufficient to justify an award of special damages. (Smolla, Law of Defamation (4th ed. 1991) § 9.07, pp. 9-15.)

The Restatement Second of Torts section 575, comments *b* and *c*, discusses special damages and states in part:

"*b. Special harm.* Special harm, as the words are used in this Chapter, is the loss of something having economic or pecuniary value. . . .

". . . . . . . . . . . . . . . . . . . . . . . . . .

"Special harm must result from the conduct of a person other than the defamer or the one defamed and must be legally caused by the defamation. It is, however, immaterial whether the harmful action is taken because the person who takes it believes the defamation, or because he is unwilling to deal or to associate with *one whose reputation has been impaired by it. Loss of reputation* alone is not enough to make the defamer liable under the rule stated in this Section unless it *is reflected in some kind of economic or pecuniary loss.* So too, lowered social standing and its purely social consequences are not sufficient. Thus the fact that a slander has caused the person defamed to lose caste in the eyes of his friends and so has deprived him of many pleasant social contacts is not special harm. If, however, *the loss of reputation results in material loss* capable of being measured in money, the fact that the lowered social standing resulting from the slander itself causes the acts that produce the loss does not prevent the tangible loss from being special harm.

(See *Boswell* v. *Phoenix Newspapers, Inc.* (1986) 152 Ariz. 9 [730 P.2d 186]; *Madison* v. *Yunker* (1978) 180 Mont. 54 [589 P.2d 126]; *Hanson* v. *Krehbiel* (1904) 68 Kan. 670 [75 P. 1041].)

"*c. Emotional distress.* Under the traditional rule, the emotional distress caused to the plaintiff by his knowledge that he has been defamed is not special harm; and this is true although the distress results in a serious illness. . . ." (Italics added.)

Allowing special damages for emotional distress is contrary to the position taken by the Restatement. The Restatement follows the traditional rule that the special damage must flow from the loss of reputation, not emotional harm. Under the Restatement, the loss of income must result from a third party's knowledge of the defamation.

The traditional rule is followed in other states. In *Terwilliger* v. *Wands* (1858) 17 N.Y. 54, cited by the majority, the farmer who was slandered became distressed, melancholy, sick and pale. He was unable to work his fields and suffered a loss of income. The court found that his loss of income was the result of his own emotional distress and did not constitute special damages. Similarly, in *Danias* v. *Fakis* (Del. Super. Ct. 1969) 261 A.2d 529, plaintiff could not prove special damages for loss of wages when she stayed home and did not go to work for three days as a result of her embarrassment caused by the defamation. In *Lind* v. *O'Reilly* (Colo.Ct.App. 1981) 636 P.2d 1319 plaintiff could not establish special damages by proving that because of emotional distress he made less than his usual profit from his investment decisions.

Nor should it make a difference that a third party observed the illness resulting from the emotional distress and decided not to hire the person defamed. Otherwise, some astute plaintiff's lawyer would have been able to take the farmer in *Terwilliger* out for a job interview in his distraught state and collect damages if he failed to obtain a job.

The majority notes that *Gomes* v. *Fried* (1982) 136 Cal.App.3d 924 [186 Cal.Rptr. 605] impliedly indicates lost time out of work attributable to the defamation constitutes special damages. *Gomes* is of little assistance since there was no lost income and the court never examined the issue of whether the loss of income must result from another person's knowledge of the defamation or could flow from emotional distress or illness.

To be consistent with the traditional rules, section 48a, subdivision 4(b) must be interpreted to allow as special damages for loss of income only those losses caused by a third party's conduct resulting from the third party's knowledge of the defamation. There is no evidence to suggest that when the Legislature adopted section 48a or modified it by changing from "actual" to "special" damages in 1945 it intended to expand the traditional rule. Section

48a is a limitation, not an expansion, of the rules providing damages to a defamed party. While one can sympathize with O'Hara, under the present state of the law, without a demand for retraction, she is not entitled to damages resulting from her inability to work caused by her emotional problems irrespective of whether these emotional problems or their physical manifestations observed by a third party caused her to lose a job.

Nor can I conclude that the testimony of Cravens, Maloney and Wood was merely harmless, even if McDaniel's testimony, or O'Hara's version of McDaniel's testimony, is considered evidence of special damages. The testimony of her emotional state and her refusal to accept job offers clearly impacted the jury. O'Hara's counsel utilized the Wood testimony in closing argument to establish her potential earning capacity to be $50,000 per year. The jury awarded $300,000 which appears to be her earning capacity times the six-year period for which she sought loss of income.

I agree that if O'Hara could establish the decline in her business resulted from the publication of the slanderous statement this would constitute special damages. The court did not limit her to that theory of proof. It allowed her to prove special damages resulting from her inability to work caused by emotional distress. This was error. Accordingly, I would reverse.

A petition for a rehearing was denied July 24, 1991, and the petition of defendants and appellants for review by the Supreme Court was denied October 3, 1991.