Kelly Davis, Cynthia Vick, and Misty Bailey filed a civil action against James Dixon in the Jefferson County Circuit Court. In their complaint, the plaintiffs alleged that on May 18, 1998, Dixon negligently or wantonly caused his pickup truck to collide with an automobile driven by Davis and in which Vick and Bailey were passengers.[1] Following a trial on September 27, 2000, the jury returned a general verdict in favor of Dixon, and the trial court entered a judgment in his favor. On October 25, 2000, Davis, Vick, and Bailey filed a motion for a new trial; the trial court granted that motion on the stated ground that the weight of the evidence did not support the jury's verdict. Dixon appealed to the Alabama Supreme Court, which transferred the appeal to this court pursuant to Ala. Code 1975, § 12-2-7(6).
The evidence reflects that at the time of the collision, Bailey and Vick were seated in the front seat of the vehicle that Davis was driving; Davis's two children and Vick's two children were seated in the rear of the vehicle. According to Davis, at the time of the collision, she had been traveling north in the inside lane of 18th Street (a four- lane road) at approximately 20-25 miles per hour. As Davis was proceeding through the intersection of 18th Street and 4th Avenue South, Dixon's truck was in the southbound left-turn lane of 18th Street. It is undisputed that at the time of the collision, the weather was clear and that the traffic signal at the intersection of 18th Street and 4th Avenue South, where the collision occurred, was green for the traffic traveling on 18th Street. The evidence also reflects that the traffic signal had no left-turn indicator.
The record reflects that the vehicle Davis was driving was owned by Vick's parents, and that Davis was driving that vehicle because Vick was experiencing vision problems on the day of the collision. Davis testified that she had noticed Dixon's vehicle approximately 100 yards before the vehicle she was operating entered the intersection of 18th Street and 4th Avenue South. Davis stated that she did not see Dixon's truck enter her lane before the collision, that she had remained in the northbound lane of 18th Street, and that she had not crossed the center line of 18th Street into Dixon's lane of travel. On cross-examination, Davis admitted that she had not actually seen Dixon's vehicle cross the center line of 18th Street. Davis also testified that since the collision she had not talked to Dixon or to DeWayne Hagan, the Birmingham police officer who investigated the collision.
Both Vick and Bailey testified that Dixon's truck had crossed into Davis's lane of travel and that Davis had not crossed the center line of 18th Street into Dixon's lane. Vick also testified that at the time of the collision, Dixon appeared to have been talking on a cellular telephone and looking *Page 1278 
down. Vick stated that when the traffic signal for traffic traveling on 18th Street changed to green, Dixon waited approximately 10-15 seconds and then accelerated his truck into the plaintiffs' vehicle, causing the left front portion of Dixon's truck to impact the front fender of the plaintiffs' vehicle on its right side. Vick stated that Dixon's vehicle had moved approximately 10 feet from where she had first seen it to the point of impact and that she believed Dixon had accelerated at a high rate of speed because right before the collision she had heard the sound of the truck motor. According to Vick, both at the time of the collision and after the collision, Dixon's vehicle had crossed into Davis's lane and Davis had not moved out of her lane. Davis, Vick, and Bailey all testified that Davis could not have avoided the collision and that they each had suffered neck, back, and other injuries as a result of the collision.
On cross-examination, Vick stated that on the day of the collision she had requested that Davis drive Vick's parents' vehicle because Vick was suffering from a migraine headache. Counsel for Dixon then pointed out that at her deposition, Vick had testified that she had requested Davis to drive because Vick had obtained new eyeglasses, had experienced vision problems, and was not familiar with the area of Birmingham in which they would be driving. When questioned about whether she had given inconsistent testimony, Vick stated that migraine headaches made it difficult for her to see on occasion and that sometimes she could not determine whether her vision problem was the result of a migraine or of her eyeglasses.
Officer Hagan had prepared an Alabama Uniform Accident Report (the "report") during his investigation of the collision. During his testimony, Officer Hagan referred to the report and stated that he was relying solely on the report for the details of his investigation. Officer Hagan testified that Davis had informed him that Dixon had turned his truck into her vehicle and that Dixon had stated that he had not seen the plaintiffs' vehicle until the collision occurred. On cross-examination, Officer Hagan confirmed that as part of his investigative training, he had learned to distinguish between what a driver tells him about a motor-vehicle incident, what a witness states about such an incident, and what he discovers about such an incident through other means. Hagan testified that the report reflected that Dixon had stated that the traffic signal had been green and that Dixon had stated that he had not seen the plaintiffs' vehicle until the collision. Officer Hagan confirmed that the report also stated that Dixon was turning left; however, Officer Hagan admitted that the report did not reflect how he had obtained that information. Officer Hagan testified that he could not determine whether Dixon had informed him that he had been turning left or whether he had based that conclusion upon his own experience, training, and knowledge. Officer Hagan also confirmed that other portions of the report indicated that Dixon had been turning left and that Dixon's turn had caused the collision. However, Officer Hagan testified that those portions of the report had been based in part on his narrative summary and that he could not determine with absolute certainty the source of that information.
During his testimony, Officer Hagan also referred to a diagram that he had prepared from the report.[2] When asked *Page 1279 
whether the diagram accurately reflected the intersection of 18th Street and 4th Avenue South, Officer Hagan stated that it did, but that he had not included in the diagram the actual traffic lanes on 18th Street. He noted that the report had not included the left-turn lane on 18th Street because there had been insufficient room on the form to draw the entire intersection.
Dixon, a corrections officer for the Shelby County jail, testified that at the time of the collision, he had been attempting to locate McCain Uniform Company; however, he was not familiar with Birmingham at the time. Dixon admitted that he was carrying a cellular telephone in his truck on the date of the collision, but stated that he had not been using the cell phone at the time of the collision. According to Dixon, at the time of the collision, he had stopped in the left-turn lane on 18th Street and was preparing to turn left onto 4th Avenue South. Dixon stated that his first recollection of the plaintiffs' vehicle was when he saw the hood of his truck buckling from the force of the collision.
Dixon testified that he could not disagree with Officer Hagan's testimony that an improper turn had caused the collision because Officer Hagan had testified that "what he had to work with was where the vehicles came to rest. That's what he saw. He did not see the accident. He saw the position of the vehicles after they had come to rest." When asked whether Officer Hagan's report was correct or incorrect, Dixon stated, "If the officer's police report states that I was turning left . . . based upon the vehicles at rest, then I will have to say, I will have to agree with the police officer. I have no choice, sir." However, when questioned about whether he had stopped in the left-turn lane or was moving when the collision occurred, Dixon stated as follows:
 "A: If memory serves me correctly from the deposition, my foot was on the brake and the clutch was coming up. Therefore, I couldn't have been moving unless you drive one with the brake on it.
 "Q: So your answer is you were stopped when the collision occurred?
"A: I was preparing to move but had not yet moved.
"Q: You had not moved when this collision occurred?
"A: I was preparing to move."
(Emphasis added.)
Dixon testified that the plaintiffs' vehicle collided with the front of his truck, but that he did not know how the collision occurred or where the plaintiffs' vehicle had come from. Dixon stated that he had performed a thorough survey of traffic conditions, but he had not noticed the plaintiffs' vehicle. Further, Dixon testified that he had investigated accidents when he had lived in Virginia. He admitted that Officer Hagan's diagram reflected that both vehicles had come to rest in the northbound lanes of 18th Street following the collision. Dixon testified that although Officer Hagan's diagram was generally correct, he believed that the vehicles had come to rest closer to the northern side of the intersection than the diagram reflected. Dixon's testimony regarding the diagram and a picture that reflected the alleged damage to the plaintiffs' vehicle was as follows:
 "Q: [Officer Hagan has] got the front end of your truck up against the left front quarter panel of that Buick.
"A: Yes, sir, as the picture says.
 "Q: And is that where the front of your truck hit their Buick?
 "A: I think that's where their Buick hit the front of my truck. *Page 1280 
 "Q: Well, were they moving straight, or were they moving sideways?
 "A: Mr. Lewis, I cannot say because I didn't see them until the accident occurred.
". . . .
 "Q: Are you testifying that the plaintiffs came over into the left turn lane and hit your vehicle.
 "A: Mr. Lewis, with all due respect, . . . I can't testify to where these ladies came from because I don't know.
". . . .
 "Q: You investigated wrecks, so you know something about it. Where in the four corners . . . of this intersection did this collision take place?
". . . .
 "A: To the left of the center line. Again, to the left of the center line is the best as I can tell you.
 "Q: When you say `the left of the center line,' are you talking about the left of this line I have drawn, this dotted line that's not very straight?
"A: Now, run your finger down there again.
"Q: This dotted line that I drew. There is a ruler here.
 "A: You don't have to go through the artwork. That's fine.
 "Q: I am just going to put this up here. If that's the side of the road —
 "A: The vehicles came to rest at the left of the center line; therefore, the accident had to occur either on or just slightly to the left of the center line.
". . . .
 "Q: Now, this is the left turn lane, and your truck was stopped here before you get to the crosswalk; is that right?
"A: Yes, sir.
"Q: And you say you didn't move this truck?
"A: I said I don't recall moving the truck.
 "Q: But your truck got from north of this curve line right here, your truck got here up to here some way, did it not?
"A: That's where it came to rest, yes, sir.
". . . .
 "Q: But your vehicle got up in here from this position here where it was stopped?
"A: Yes, sir.
"Q: Because you were stopped behind the crosswalk?
"A: Yes, sir.
"Q: You didn't enter the crosswalk?
"A: I was preparing to turn, Mr. Lewis.
". . . .
"Q: You were stopped behind the crosswalk?
 "A: I was either stopped behind this big white line or between the big white line and the crosswalk, Mr. Lewis.
 "Q: So, you were stopped some feet back from the intersection itself?
 "A: Well, I wouldn't say feet, probably. In actuality, inches.
 "Q: And somehow or another your truck got out into the intersection; is that correct?
 "A: That's the way it is depicted; and, again, I won't argue with a law enforcement officer.
 "Q: I'm talking about what you said that it was in the intersection and came to rest on the northbound lanes —
"A: After the point of impact.
"Q: — after the point of impact?
"A: Yes, sir."
We note that, as a general rule, jury verdicts are presumed correct and a trial court's decision to grant a new trial *Page 1281 
based on the weight of the evidence is subject to careful scrutiny. SeeScott v. Farnell, 775 So.2d 789 (Ala. 2000). As the Alabama Supreme Court has held,
 "[A]n order granting a motion for new trial on the sole ground that the verdict is against the great weight or preponderance of the evidence will be reversed for abuse of discretion where on review it is easily perceivable from the record that the jury verdict is supported by the evidence."
Jawad v. Granade, 497 So.2d 471, 477 (Ala. 1986); see also, e.g., Owensv. Lucas, 604 So.2d 389 (Ala. 1992). In light of the standard set forth in Jawad, the Alabama Supreme Court has stated that "the trial court is left with no discretion to grant a new trial on a `weight of the evidence' ground, except when the verdict and the judgment entered thereon are so against the great weight and preponderance of the evidence as to be `plainly and palpably' wrong, i.e., `manifestly unjust.'"Richardson v. Joines, 574 So.2d 787, 788 (Ala. 1991); see also Malloryv. Hobbs Trailers, 554 So.2d 966 (Ala. 1989). Also, we note that in reviewing the trial court's decision, we "must review the evidence in the light most favorable to the prevailing party and must indulge all reasonable inferences the jury was free to draw." Floyd v. Broughton,664 So.2d 897, 900 (Ala. 1995); see also Cooper v. Peturis, 384 So.2d 1087
(Ala. 1980).
Based upon the foregoing, the issue for our determination is whether it is "easily perceivable" from the record that the jury verdict in favor of Dixon is supported by the evidence when viewed in the light most favorable to Dixon and indulging all reasonable inferences that the jury was free to draw.
Davis, Vick, and Bailey all testified that Davis did not cross into Dixon's lane and that Dixon crossed into Davis's lane. The main proposition in Davis, Vick, and Bailey's argument is that the collision could not have occurred unless one party was negligent and, because the trial court entered a JML on Dixon's contributory-negligence defense, Dixon must have been negligent. However, Dixon did not cross-appeal from the JML against him. "The burden was upon the plaintiff, if he is to recover, to establish negligence to the reasonable satisfaction of the trier of fact." Horton v. Mobile Cab Baggage Co., 281 Ala. 35,42, 198 So.2d 619, 625 (1967). Further, "[i]t is the settled law that the credibility of the witnesses is the province of the jury." Floyd, 664 So.2d at 900.
Dixon testified that he had stopped and that he was preparing to turn when the collision occurred. Although Dixon stated that he had performed a thorough survey of traffic conditions, he stated that he did not see where the plaintiffs' vehicle came from and that he did not know how the collision had occurred. However, he stated that the plaintiffs' vehicle had collided with his truck. Also, Dixon stated that following the collision, his truck came to rest in the northbound lane of 18th Street on the north side of the intersection of 18th Street and 4th Avenue South. He admitted that based upon his experience, which included experience investigating automobile collisions, the position of the vehicles following the collision indicated that his vehicle had been either on or to the left of the centerline of the diagram Officer Hagan had prepared. However, it appears from Officer Hagan's testimony that the diagram did not accurately represent the actual lanes on 18th Street, and Dixon's testimony illustrates that the centerline in question was a line drawn by Davis's counsel and that that line was not straight. *Page 1282 
Further, even if Dixon's truck was on or to the left of the centerline of 18th Street at the time of the collision, the evidence would not require the jury to conclude that Dixon had caused the collision. Davis testified that she had seen Dixon from approximately 100 yards away. She stated that she did not see his vehicle cross the centerline of 18th Street. From the evidence, the jury could have determined that Dixon was stopped at the time of the collision or that he was preparing to move, but that his vehicle did not turn into the plaintiffs' vehicle. The jury also could have found that the plaintiffs' failed to satisfy their burden of proof regarding Dixon's alleged negligence, and that, based upon the testimony presented at trial, it could not determine how the collision had occurred.
Based upon the foregoing, we conclude that it is "easily perceivable" from the record that the jury verdict is supported by the evidence. The trial court therefore abused its discretion in granting the plaintiffs' motion for a new trial. The trial court's order granting the plaintiffs' motion for a new trial is reversed, and the case is remanded with instructions for the trial court to reinstate the verdict of the jury and to enter a judgment thereon.
REVERSED AND REMANDED WITH INSTRUCTIONS.
Yates, P.J., and Crawley, Thompson, and Pittman, JJ., concur.
[1] The trial court granted Dixon's motion for a judgment as a matter of law ("JML")on Davis, Vick, and Bailey's claims of wantonness. We also note that Dixon filed an answer alleging the defense of contributory negligence, but the trial court granted a motion for a JML filed by Davis, Vick, and Bailey as to that defense.
In addition, Dixon filed a counterclaim against Davis, Vick, and Bailey alleging that they were guilty of negligent or wanton conduct. The parties' briefs on appeal state that the counterclaim was dismissed either before or at trial, although the record does not reflect that dismissal. Nevertheless, because Dixon presented no argument regarding his counterclaim at trial, because the jury was not charged regarding the counterclaim, and because neither the verdict form nor the trial court's judgment mention Dixon's counterclaim, the trial court's judgment was a final judgment that disposed of Dixon's counterclaim. See Poston v.Gaddis, 372 So.2d 1099 (Ala. 1979).
[2] Both Officer Hagan and Dixon referred to the diagram during the trial; however, neither the report nor the diagram were offered as evidence or are included in the record on appeal.